**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| NIAL BENTON and HUTTON GRAHAM, individually and on behalf of similarly situated persons, | * | |
| | * | |
| | | Case No. 1:17-cv-00296-TCB |
| Plaintiffs, | * | |
| v. | | |
| | * | |
| DELI MANAGEMENT, INC. d/b/a "JASON'S DELI," | * | |
| | * | |
| Defendant. | * | |

**PLAINTIFFS' CONSOLIDATED MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

**OVERVIEW**

**ISSUE 1:   PLAINTIFFS MAY PROVE THEIR CLAIMS BASED ON ESTIMATED VEHICLE COSTS**

Every court to consider this issue has found that plaintiffs alleging minimum wage violations resulting from unreimbursed vehicle costs may rely on estimated vehicle costs to prove their claims.  Thus, courts hold that plaintiffs need not prove, nor even know, their actual vehicle costs.  Those decisions are based on the applicable regulations and firmly grounded in common sense.

**ISSUE 2:   AN EMPLOYER MUST REIMBURSE A PORTION OF THE FIXED COSTS OF DRIVING AND THE APPLICABLE TEST IS WHETHER AN EMPLOYER "TENDS TO SHIFT COSTS" TO EMPLOYEES**

Defendant Deli Management, Inc. d/b/a "Jason's Deli" ("Jason's Deli") may seek to avoid reimbursing for vehicle insurance costs and other fixed costs of driving that reduce net wages below the minimum. In fact, Jason's Deli's vehicle reimbursements provided to its delivery drivers are only based on the cost of gasoline. Ex. 1. But Jason's Deli specifically requires that its delivery drivers provide their own operable, safe and legally-compliant delivery vehicles and vehicle insurance.  Employers must reimburse for such fixed costs of driving, including insurance, to the extent those costs reduce net wages below the minimum pursuant to (a) controlling Eleventh Circuit law, (b) the express language of the U.S. Department of Labor's ("DOL's") "anti-kickback regulation," (c) the DOL's interpretative guidance, and (d) the law applicable to minimum wage claims based on under-reimbursed vehicle costs. Thus, the Court should grant summary judgment on the issue of whether Jason's Deli must reimburse for fixed costs of driving.

On a related note, the Court should also grant summary judgment finding that the applicable test for determining a duty to reimburse costs is the Eleventh Circuit's "tends to shift costs" test.

## ISSUE 3:  TIPS DO NOT COUNT TOWARD THE MINIMUM WAGES

In businesses where tipping is customary, the tips, in the absence of an explicit contrary understanding, belong to the tipped employee. *Williams v. Jacksonville Terminal*, 315 U.S. 386, 397 (1942). Consistent with this long-standing principle,

the Fair Labor Standards Act ("FLSA") permits employers to use tips as a credit towards its minimum-wage obligations, but only if the employer provides (1) advanced notice to its tipped employees and (2) the employer factors the entire amount of the tip credit into the overtime rate. Under all cases to decide the issue, any tips received in excess of the amount of a valid tip credit remain property of employees, and cannot be counted toward the minimum wage. Here, it is undisputed that Jason's Deli took no tip credit toward its delivery drivers' pay. Thus, no tips count toward the delivery drivers' net wages.

**ISSUE 4:    JASON'S DELI CANNOT COME FORTH WITH EVIDENCE TO SUPPORT ITS AFFIRMATIVE DEFENSES AND / OR THOSE AFFIRMATIVE DEFENSES FAIL AS A MATTER OF LAW**

Jason's Deli's first affirmative defense is its purported lack of willfulness, its second affirmative defense is "good faith and reasonable grounds" to believe it complied with the FLSA, its third affirmative defense is payment in compliance with the FLSA, and its fifth affirmative defense is untimely assertion of claims. However, summary judgment is warranted on all those defenses because Jason's Deli admits that it lacks evidence to support such defenses. Doc. 7, ¶¶ 62-64 & 66.

Jason's Deli pleads the *de minimis* defense as its fourth affirmative defense. *Id.*, ¶ 65. Summary judgment is appropriate because the "*de minimis*" defense does not apply to minimum wage claims based on unreimbursed vehicle costs. Moreover,

summary judgment should be granted because Jason's Deli admits that it lacks evidence needed to prove that defense.

## STATEMENT OF UNDISPUTED FACTS

### A. The Parties

1. Jason's Deli owns and operates a chain of approximately 158 delicatessens. Compl. (Doc. 1), ¶¶ 5 & 8; Ans. (Doc. 7), ¶¶ 5 & 8; Ex. 2; Ex. 3 (Rule 30(b)(6) Dep.), 9:19-22, 12:3-5.

2. Jason's Deli employs numerous delivery drivers, who are primarily responsible for delivering food items to customers' homes and workplaces. Ex. 4.

3. The delivery drivers use their own vehicles to deliver Jason's Deli's food to its customers and provide other catering services. Compl., ¶ 10; Ans., ¶ 10; Ex. 4; Ex. 5, at 2 ("Your car is part of your job…"); Ex. 3, 20:5-1, 65:21-25.

4. During the recovery period, Jason's Deli has classified all of its delivery drivers as "non-exempt" from the FLSA. Ex. 3, 44:14-45:4.

## ISSUE 1:   PLAINTIFFS MAY REASONABLY APPROXIMATE THEIR VEHICLE COSTS

This is a pure issue of law which entails no underlying facts.

## ISSUE 2: JASON'S DELI MUST REIMBURSE A PORTION OF THE FIXED COSTS OF DRIVING / THE APPLICABLE "TENDS TO SHIFT COSTS" TEST

5.   Jason's Deli requires all of its delivery drivers to agree that "[t]he vehicle [they] use for delivery services will … [b]e maintained in good condition and repair." Ex. 5, at 1; Ex. 3, 68:9-69:18, 70:8-20.

6.   Jason's Deli requires that all of its delivery drivers "[c]omply with all rules and regulations governing safe and lawful operation" of their vehicles.  *Id.*

7.   Jason's Deli expressly warns its delivery drivers that "[a]ny vehicle defects that make the vehicle unsafe to drive … can result in loss of driver's status or immediate termination."  Ex. 6, at 28.

8.   Jason's Deli requires its delivery drivers to acknowledge that they "understand that any violation of [that] Agreement or of any of the standards, procedures or guidelines applicable to [their] Delivery Driver position may result in suspension or termination.  Ex. 5, at 1.

9.   Jason's Deli expressly warns its delivery drivers:

> Your car is part of your job, and must meet the following requirements before coming to work:
> 1.) You must have enough gas for the entire shift.
> 2.) Your car must be clean inside and out.
> 3.) All mechanical items must be working, including wipers, turn signals, and horn. Air conditioning must be working for food safety purposes.

Ex. 5, at 2; Ex. 3, 70:21-72:19.

10. Jason's Deli requires that "[b]efore taking deliveries [the delivery drivers must] check that [their] vehicle[s are] in proper working order including brakes, signals, lights, and other components." *Id.*

11. Jason's Deli requires:

> Your tire pressure must be at the recommended levels and all tire tread depth must be at least 2/32 of an inch.  An acceptable measure of this is to place a penny head first into several treat grooves across all your tires.  If you always see the top of Lincoln's head, your treads are shallow and worn.  If this is the case, your tires need to be replaced prior to placing your vehicle in service.

Ex. 5, at 2; Ex. 3, 72:24-73:7, 75:7-18.

12. Jason's Deli further requires its delivery drivers to:

> Wipe off headlights frequently for good night vision.
> Keep your windshield washer reservoir filled with non-freezing solvent.
> Avoid long warm-up time – it breaks down oil and causes engine wear.
> Overnight in very cold weather, park your car where it won't receive a direct wind.  Also, consider removing the battery and taking it inside.  Another option is an engine block heater, which can be purchased for less than $50.
> Squirt WD-40 into door locks to prevent moisture freeze-up."

Ex. 6, at 34.

13. Jason's Deli requires that its delivery drivers provide all insurance for their vehicle.  Ex. 6, at 27; Ex. 7, at 27; Ex. 3, 78:10-25, 80:3-20.

14. Jason's Deli's "Vehicle Safety Statement of Policy" expressly states that "[i]t is … the responsibility of any person operating a motor vehicle on behalf of Deli Management, Inc to maintain third party liability insurance covering their activities

in an amount that at least meets the minimum state requirements of their state." Ex. 6, at 27.

15. Jason's Deli requires its delivery drivers to provide proof of insurance: "…proof of vehicle insurance must be provided and a copy of the card will be included in the driver's employee file." Ex. 7, at 27; Ex. 3, 80:3-20.

16. Jason's Deli expressly warns that "failure to have a valid driver's license or insurance for the vehicle being driven … can result in loss of driver's status or immediate termination[.]" Ex. 7, at 28; Ex. 3, 80:21-81:17.

17. Jason's Deli readily admits that its delivery drivers incur vehicle costs to perform their jobs. Ex. 3, 200:23-201:5.

## ISSUE 3:   TIPS IN EXCESS OF THE AMOUNT OF THE TIP CREDIT CANNOT BE CONSIDERED IN DETERMINING NET WAGES

18. Jason's Deli pays all of its delivery drivers through hourly wages. Ex. 3, 130:19-21.

19. Jason's Deli has not used a tip credit to pay its delivery drivers. *Id.*, 45:22-25.

## ISSUE 4:   JASON'S DELI'S AFFIRMATIVE DEFENSES FAIL DUE TO LACK OF EVIDENTIARY SUPPORT AND / OR AS A MATTER OF LAW

**Affirmative Defense 2: "Plaintiffs and other similarly situated persons may not recover liquidated damages because Defendant acted with reasonable grounds to believe its acts or omissions did not violate the FLSA, and others acted in good faith."  Ans., ¶ 63.**

20. The only five people that Jason's Deli has disclosed as having knowledge of its vehicle reimbursement rate are Troy Cormier, Ragan Edgerly, Keith Kemplay, Brian Hebert and Willa White.  Ex. 8.

21. Jason's Deli's Chief Executive Officer ("CEO"), Troy Cormier, does not know any facts upon which Jason's Deli bases its belief it acted in good faith in creating its delivery driver reimbursement policy.  Ex. 9, 5:21-24, 64:1-9 ("Q. What facts does Jason's Deli have to base its belief on that it acted in good faith with regard to the creation of its delivery driver reimbursement policy? A. I don't – [objection omitted] Q.  Your answer? A. Yeah, I don't know that.").

22. Mr. Cormier does not know any facts upon which Jason's Deli bases its belief that it has administered its vehicle reimbursement policy in good faith.  *Id.,* 64:10-21 ("Q. What facts does Jason's Deli have to base its belief on that it has administered its vehicle reimbursement policy in good faith? [objection omitted] A. So, when you say "administered," that was different.  So, what does that mean?  Q. Meaning the changes in the vehicle rates, making sure it's treated the delivery drivers fairly with respect to reimbursements on an ongoing basis. A. Okay. Well, I do not know.").

23. Jason's Deli's President, Ragan Edgerly, does not know any facts upon which Jason's Deli bases its belief that it acted with good faith reasonable grounds to believe that it did not violate the FLSA.  Ans., ¶ 63; Ex. 10, 5:25-6:2, 102:25-103:7

("Q. Do you have facts or other evidence, documents that you can point to that you believe support that defense that's stated in paragraph 63? [objection omitted] A.·No.· I don't know.").

24. Jason's Deli's Chief Financial Officer ("CFO"), Brian Hebert, does not know any facts upon which Jason's Deli based its assertion that Jason's Deli's reimbursement policy was created with reasonable grounds for believing that it was in compliance with the FLSA. Ex. 11, 41:6-10 ("Q.   Do you have any facts to show that Jason's Deli created its delivery driver reimbursement policy based on reasonable grounds to believe that it didn't violate the Fair Labor Standards Act? A. I don't know."); 42:11-15 ("Q. What facts do you have to show that Jason's Deli's reimbursement policy was created with reasonable grounds for believing that it was in full compliance with the FLSA? A. I don't know.").

25. Willa White, Jason's Deli's Director of Accounts Payable who actually determined Jason's Deli's vehicle reimbursement rate, has no facts to indicate that Jason's Deli acted with reasonable grounds to believe that its vehicle reimbursement rate did not violate the FLSA. Ex. 12, 6:12-13, 31:25-32:9 ("Q. Okay.  Do you have any facts to show that Jason's Deli acted with reasonable grounds to believe its acts or omissions regarding its vehicle reimbursement rate for delivery drivers did not violate the FLSA or Fair Labor Standards Act? A. Do I have -- Q. Yes. A. -- any facts? Q. Yes. A. No, I do not.").

26. Ms. White has no facts to show that Jason's Deli acted in good faith regarding its vehicle reimbursement policy. Ex. 11, 32:10-16 ("Q. Do you have any facts to show that Jason's Deli otherwise acted in good faith with respect to its vehicle reimbursement rate for delivery drivers? [objection omitted] Q. Your answer? A. I have no facts.").

27. Mr. Cormier does not know of any actions taken by Jason's Deli to determine whether its vehicle reimbursement policy complies with the FLSA's requirements regarding vehicle costs. Ex. 9, 65:3-8 ("Q. What efforts did Jason's Deli take to determine that it was in compliance with the FLSA requirements regarding vehicle costs? [objection omitted] A. I don't -- I don't know."), 65:9-15 ("Q. What efforts has Jason's Deli made to determine whether its vehicle reimbursement policy complies with the FLSA? [objection omitted] A. Don't know.").

28. Mr. Edgerly does not know of any efforts that Jason's Deli took to determine what the FLSA requires. Ex. 10, 104:8-13 ("Q. What efforts are you aware of that Jason's Deli undertook to determine what the FLSA requires? [objection omitted] A.·I don't know.").

29. Mr. Edgerly does not know any efforts that Jason's Deli took to determine whether its vehicle reimbursement policy is compliant with the FLSA. Ex. 10, 104:14-19 ("Q. What efforts did Jason's Deli make to determine whether it was compliant with the FLSA? [objection omitted] A. I don't know.").

30. Mr. Cormier does not know if Jason's Deli reviewed the FLSA in determining its vehicle reimbursement policy. Ex. 9, 66:1-4 ("In determining its vehicle reimbursement policy, did Jason's Deli review the Fair Labor Standards Act itself? A. I don't know.").

31. Mr. Cormier does not know whether Jason's Deli has consulted the FLSA in administering its vehicle reimbursement policy. Ex. 9, 66:8-15 ("Q. In administering its vehicle reimbursement policy, has Jason's Deli consulted with the Fair Labor Standards Act itself? [objection omitted] A. I don't know.").

32. Mr. Edgerly is unaware of whether Jason's Deli reviewed the FLSA in creating its vehicle reimbursement policy. Ex. 10, 105:11-16 ("Q. In creating the vehicle reimbursement policy, did anyone at Jason's Deli review the FLSA itself, to your knowledge? [objection omitted] A.·Not to my knowledge."), 105:17-21 (similar).

33. Keith Kemplay, a member of Jason's Deli's "Concept Team" and its former Director of Internal Audit, who participated in designing Jason's Deli's reimbursement policy, is not aware of anyone reviewing the FLSA in implementing that reimbursement policy. Ex. 13, 11:5-7, 21:15-25, 83:11-19 ("Q. Are you aware of anyone at Jason's Deli who reviewed the FLSA in implementing the current reimbursement policy to delivery drivers? [objection omitted] A.·I'm not sure. Q.

Are you aware of anyone who reviewed it at Jason's Deli? A. I'm not aware of anyone, no.").

34. Mr. Cormier admitted that Jason's Deli did not consult the FLSA regulations in creating its vehicle reimbursement policy.  Ex. 9, 66:16-25 ("Q. In creating its vehicle reimbursement policy, did Jason's Deli consult the Fair Labor Standards Act regulations? [objection omitted] Q. Your answer? A. No, sir.").

35. Mr. Cormier does not know whether Jason's Deli consulted the FLSA regulations in administering its vehicle reimbursement policy.  Ex. 9, 67:1-8 ("Q. Okay.  In determining its -- or in administering its vehicle reimbursement policy for delivery drivers, has Jason's Deli consulted the Fair Labor Standards Act regulations? [objection omitted] A. I mean, again, I'm going to ask:  When you say "administering" -- well, the answer's the same, I do not know.").

36. Mr. Edgerly is unaware of anyone at Jason's Deli reviewing the FLSA regulations.  Ex. 10, 105:22-25 ("  Q. Did anyone review the FLSA regulations? [objection omitted] A.·Not to my knowledge.").

37. Mr. Kemplay is unaware of anyone at Jason's Deli reviewing the FLSA regulations.  Ex. 13, 83:20-22 ("Q. Okay.· Are you aware of anyone reviewing the FLSA regulations? A. I'm not aware of anyone, no.").

38. Mr. Cormier is unaware of anyone at Jason's Deli consulting any administrative guidance in creating Jason's Deli's vehicle reimbursement policy.

Ex. 9, 67:9-16 ("Q. In creating its vehicle reimbursement policy for delivery drivers, has Jason's Deli consulting -- consulted any administrative guidance regarding the Fair Labor Standards Act? [objection omitted] A.   Same answer. Q.   (BY MR. POTASHNICK) Which is? A.   I do not know.").

39. Mr. Cormier is unaware of anyone at Jason's Deli consulting any administrative guidance in administering its vehicle reimbursement policy.  Ex. 9, 67:17-22 ("Q. In administering its vehicle reimbursement policy for delivery drivers, has Jason's Deli consulted any administrative guidance regarding the Fair Labor Standards Act? [objection omitted] A. I do not know.").

40. Mr. Edgerly does not know if anyone at Jason's Deli consulted any administrative guidance.   Ex. 10, 106:1-3 ("Q.·Any administrative guidance? [objection omitted] A. I don't know.").

41. Mr. Kemplay is unaware of anyone at Jason's Deli reviewing any administrative guidance.  Ex. 13, 83:23-84:2 ("Q.· Okay.· Are you aware of anyone reviewing administrative guidance from the Department of Labor? [objection omitted] A. I'm not aware of anyone."), 83:3-8 ("Q. Aware of review by anyone at Jason's Deli within the context of the reimbursement fee reviewing DOL materials? [objection omitted] A.·Not that I'm aware of.").

42. Mr. Cormier is unaware of whether Jason's Deli reviewed any order by the DOL in creating its vehicle reimbursement policy.  Ex. 9, 67:23-68:2 ("Q. Okay. In

creating its vehicle reimbursement policy, has Jason's Deli considered any order by the U.S. Department of Labor?" [objection omitted] A. I do not know.").

43. Mr. Cormier is unaware of whether Jason's Deli has reviewed any order by the DOL in administering its vehicle reimbursement policy. Ex. 9, 68:3-8 ("Q. In administering its vehicle reimbursement policy for delivery drivers, has Jason's Deli considered any order by the U.S. Department of Labor? [objection omitted] A.   I do not know.").

44. Mr. Edgerly is unaware of whether Jason's Deli reviewed any order by the DOL regarding its vehicle reimbursements. Ex. 10, 106:11-17 ("Q.·Right.·Are you aware of anyone at Jason's Deli reviewing a memo or an order from the Department of Labor – A. No. Q.·-- with relation to the vehicle reimbursement fee? A.·Sorry.·No.").

45. Mr. Cormier does not know whether Jason's Deli consulted any order by any state wage and hour agency in creating its vehicle reimbursement policy. Ex. 9, 68:9-14 ("Q. In creating its vehicle reimbursement policy, has Jason's Deli consulted any order by any state wage and hour agency? [objection omitted] A. Do not know.").

46. Mr. Cormier does not know whether Jason's Deli consulted any order by any state wage and hour agency in administering its vehicle reimbursement policy. Ex. 9, 68:15-19 ("Q. In administering its vehicle reimbursement policy, has Jason's Deli

consulted any order by any state wage and hour agency? [objection omitted] A. I don't know.").

47. Mr. Cormier does not know whether Jason's Deli considered any court order in creating its vehicle reimbursement policy. Ex. 9, 68:20-24. ("Q. In creating its vehicle reimbursement policy, did Jason's Deli consider any order of any court? [objection omitted] A. I do not know.").

48. Mr. Cormier does not know whether Jason's Deli considered any court order in administering its vehicle reimbursement policy. Ex. 9, 68:25-69:4 ("Q. In administering its vehicle reimbursement policy, did Jason's Deli consider any order of any court? [objection omitted] A. Do not know.").

49. Mr. Cormier does not know whether Jason's Deli considered any interpretation by the DOL in creating its vehicle reimbursement policy. Ex. 9, 69:5-10 ("Q. In creating its vehicle reimbursement policy for delivery drivers, has Jason's Deli considered any interpretation by the U.S. Department of Labor? [objection omitted] A. Do not know.").

50. Mr. Cormier does not know whether Jason's Deli considered any interpretation by the DOL in administering its vehicle reimbursement policy. Ex. 9, 69:11-16 ("Q. In administering its vehicle reimbursement policy for delivery drivers, has Jason's Deli considered any interpretation by the U.S. Department of Labor? [objection omitted] A. Do not know.").

51. Mr. Cormier does not know whether Jason's Deli considered any interpretation by any state wage and hour agency in creating its vehicle reimbursement policy.  Ex. 9, 69:17-21 ("Q. In creating its vehicle reimbursement policy, has Jason's Deli considered any interpretation by any state wage and hour agency? [objection omitted] A.  I do not know.").

52. Mr. Cormier does not know whether Jason's Deli considered any interpretation by any state wage and hour agency in administering its vehicle reimbursement policy.  Ex. 9, 69:22-70:3 ("Q.  In administering its vehicle reimbursement policy for delivery drivers, has Jason's Deli considered any interpretation by any state wage and hour agency? [objection omitted] A. I  do  not know.").

53. Mr. Cormier does not know whether Jason's Deli considered any administrative practice of the DOL in creating its  vehicle reimbursement policy. Ex. 9, 70:4-8 ("Q. In creating its vehicle reimbursement policy, has Jason's Deli considered any administrative practice of the   U.S.   Department   of   Labor? [objection omitted] A. Don't know.").

54. Mr. Cormier does not know whether Jason's Deli considered any administrative practice of the DOL in administering its vehicle reimbursement policy. Ex. 9, 70:11-15 ("Q. In administering Jason's delivery driver reimbursement

policy, has Jason's Deli considered any administrative practice of the U.S. Department of Labor? [objection omitted] A. Do not know.").

55. Mr. Cormier does not know whether Jason's Deli considered any enforcement policy of the DOL in creating its vehicle reimbursement policy. Ex. 9, 70:16-20 ("Q. In creating its vehicle reimbursement policy, has Jason's Deli considered any enforcement policy of the U.S. Department of Labor? [objection omitted] A. Don't know.").

56. Mr. Cormier does not know whether Jason's Deli considered any enforcement policy of the DOL in administering its vehicle reimbursement policy. Ex. 9, 70:20-71:1 ("Q. In administering its vehicle reimbursement policy for delivery drivers, has Jason's Deli considered any enforcement policy of the U.S. Department of Labor? [objection omitted] A. I do not know.").

57. Mr. Cormier does not know whether Jason's Deli considered any opinion letter issued by the DOL in creating its vehicle reimbursement policy. Ex. 9, 71:2-6 ("Q. In creating its vehicle reimbursement policy, has Jason's Deli considered any opinion letter by the U.S. Department of Labor? [objection omitted] A. I do not know.").

58. Mr. Cormier does not know whether Jason's Deli considered any opinion letter issued by the DOL in administering its vehicle reimbursement policy. Ex. 9, 71:7-12 ("Q. In administering its vehicle reimbursement policy, has Jason's Deli

17

considered any opinion letter by the U.S. Department of Labor? [objection omitted] A. Do not know.").

59. Mr. Cormier does not know whether Jason's Deli considered any attorney's opinion in creating its vehicle reimbursement policy.  Ex. 9, 71:13-22 ("Q. In creating Jason's Deli's vehicle reimbursement policies, did Jason's Deli consider the opinions of any attorney? [objection omitted] A. You said "creating"? Q. Yes. A. I do not know.").

60. Mr. Cormier does not know whether Jason's Deli considered any attorney's opinion in administering its vehicle reimbursement policy.  Ex. 9, 71:23-72:5 ("Q. In administering its vehicle reimbursement policy, has Jason's Deli considered the opinions of any attorney? [objection omitted] A. I don't know.").

61. Mr. Cormier admits that Jason's Deli's vehicle reimbursement policy is not based on the advice of any attorney. Ex. 9, 73:3-6 ("Q. Same question:  Is Jason's Deli's vehicle reimbursement policy based on the advice of any attorney? A. No, sir.").

62. Ms. White does not know what documents or sources were consulted in determining Jason's Deli's vehicle reimbursement rate. Ex. 12, 32:17-20 ("Q. Do you know what documents or sources were consulted in determining Jason's Deli's vehicle reimbursement rate? A. No, I do not."), 23:21-25 ("Q.   Do  you  know  if any statute, regulation, statement by the U.S. Department of Labor or any state wage

and hour agency was consulted or considered in determining Jason's Deli's vehicle reimbursement rate? A. I do not know.").

63. Jason's Deli's internal auditing of its stores does not include any effort to make sure that its delivery drivers are reasonably reimbursed. Ex. 11, 27:11-25 ("Q. Back when you were an internal auditor -- A. Uh-huh. Q. -- did the internal audit process include the internal auditors checking whether there was reasonable reimbursements provided by Jason's Deli to their delivery drivers? [objection omitted] A. What do you mean, "reasonable reimbursement"? Q. A reimbursement that would fairly or fully cover their vehicle costs incurred in performing the job. A. No."), 28:1-8 ("Q. Okay.  And in your current role as CFO, is there still an internal audit process? A.   Yes. Q. And does that internal audit process include determining whether Jason's Deli has reasonably reimbursed their delivery drivers for their vehicle costs incurred in performing the job? A. No.").

64. Mr. Kemplay, Jason's Deli's former Director of Internal Audit, admitted that Jason's Deli never considered whether delivery drivers were left with subminimum wages due to vehicle reimbursements when he held that position.  Ex. 13, 64:11-22 ("Q.·Okay.· I think as I understand your testimony, again, please correct me if I'm wrong, but because you weren't looking at the -- specifically at the reimbursement fee when you were auditing the stores, you never looked at whether the reimbursement rate resulted in a shortfall in terms of minimum wage? [objection

omitted] A. Correct. Q. Are you aware of any analysis, study or audit along those lines? A. Not to my knowledge."), 71:20-72:8 ("Q.·Okay.· Do you think .0625 cents is a reasonable reimbursement rate? [objection omitted] A. I think it's an isolated case and you'd have to look at the body of the week's worth of deliveries to be able to really determine what the actual reimbursement rate was or the reimbursement per mile would be. Q.·Okay.·Does anyone at Jason's Deli do that, to your knowledge? A. Not to my knowledge. Q. You've never done that kind of analysis, right? A. Not that I'm aware of.").

65. Mr. Cormier is not aware of any efforts by Jason's Deli to determine whether its delivery drivers have been reasonably reimbursed.  Ex. 9, 93:16-21 ("Q. Are you aware of any effort by Jason's Deli to determine whether its delivery drivers have been reasonably reimbursed? [objection omitted] A. I don't know."), 109:4-10 ("Q. Okay. And is there anything done at the corporate office level to, based on the delivery driver payout forms, to make sure that the delivery drivers are reasonably reimbursed for their vehicle expenses? [objection omitted] A. Do not know."), 109:18-110:5 ("Q. Are you aware of any instance at the corporate level where it was checked whether a delivery driver was reasonably reimbursed based on their delivery driver payout forms? [objection omitted] Q. Your answer, please? A. Reasonably reimbursed based on pol- -- I don't  recall -- I don't think any -- any instances I recall. So, no, sir.").

66. Mr. Cormier does not know if Jason's Deli's delivery drivers have been reasonably reimbursed for their vehicle costs.  Ex. 9, 110:6-18 ("Q. Okay.  Do you know if Jason's Deli's delivery drivers have been reasonably reimbursed for their vehicle costs? [objection and request to take a break while question pending omitted] A. I said I do not know.").

67. Mr. Edgerly does not know if Jason's Deli's delivery drivers have been reasonably reimbursed for their vehicle costs.  Ex. 10, 95:1-7 ("Q.·Do you know whether the delivery drivers have been reasonably reimbursed?· The delivery drivers that are asserting claims in this case, have they been reasonably reimbursed for the use of their personal vehicle? A. I don't know that. Q.·Just don't know one way or the other? A.·Correct.").

68. Mr. Hebert does not know if Jason's Deli's delivery drivers have been reasonably reimbursed for their vehicle costs.  Ex. 11, 28:20-23 ("Q. Does Jason's Deli provide reasonable reimbursements to delivery drivers for the costs of driving their cars to do the job? A. I don't know.").

69. Mr. Kemplay does not know if Jason's Deli's delivery drivers have been reasonably reimbursed for their vehicle costs.  Ex. 13, 72:24-73:8 ("Q.·Do you know if the delivery drivers have been reasonably reimbursed? [objection omitted] A.·I can't speculate to that. Q. They may have been or they may not have been; you just don't know? [objection omitted] A.·Yeah, I can't speculate.").

70. Mr. Cormier does not know the amount of a reasonable reimbursement rate for Jason's Deli's delivery drivers.  Ex. 9, 61:6-11 ("Q. Do you know what a reasonable reimbursement rate for a Jason's Deli delivery driver would be based on cents per mile? [objection omitted] A. No, sir.").

71. Mr. Hebert does not know the amount of a reasonable reimbursement rate for Jason's Deli's delivery drivers.  Ex. 11, 46:21-47:1 ("Q. Do you know what a reasonable per-mile rate for delivering Jason's Deli's products to its customers would be for delivery drivers? [Objection omitted] A. I don't know what that would be.").

72. Mr. Kemplay does not know the amount of a reasonable reimbursement rate for Jason's Deli's delivery drivers.  Ex. 13, 58:5-11 ("Q.·What's a reasonable reimbursement rate per mile for Jason's Deli to pay its delivery drivers? [objection omitted] A.·I can't speak to that."), 73:9-13 (same).

73. Mr. Cormier has never done anything to determine the amount of a reasonable reimbursement rate for Jason's Deli's delivery drivers.  Ex. 9, 61:12-16 ("Q. Have you ever done anything to determine what a reasonable reimbursement rate in cents per mile would be for delivery drivers for Jason's? A. I have not.").

74. Mr. Cormier does not know whether anyone at Jason's Deli has tried to determine a reasonable reimbursement rate for its delivery drivers. Ex. 9, 61:12-21 ("Q. Have you ever done anything to determine what a reasonable reimbursement rate in cents per mile would be for delivery drivers for Jason's? A. I have not. Q. Has

anybody at Jason's Deli done that calculation? [objection omitted] A.   Do         not know.").

75. Mr. Hebert does not know whether Jason's Deli has ever tried to check to determine whether delivery drivers were reimbursed for their vehicle costs.  Ex. 11, 29:4-8 ("Q. Has anybody at Jason's deliv- -- Jason's Deli, to your knowledge, ever tried to check to see whether delivery drivers were reimbursed for their vehicle costs? A. I don't -- I don't know.").

76. Jason's Deli has not consulted with any vehicle costing expert for business purposes.  Ex. 3, 176:18-178:1; Ex. 9, 14:2-15:16 (no consultation with vehicle costing firm for business purposes, but Jason's Deli has consulted with Motus for the purpose of defending this lawsuit (although Motus was not disclosed as an expert)), Ex. 10, 71:3-10 ("Q.·Sure.·Yeah.· Are you aware --· excluding what may or may not have been done in conjunction with this lawsuit and since the lawsuit was filed, are you aware of, again, outside of this lawsuit, anyone within Jason's Deli consulting with a vehicle  costing consultant regarding the delivery reimbursement rate? A.·No.").

**Affirmative Defense 1:   "Defendant states that any acts or omissions which may be found to be in violation of the rights afforded by the FLSA were not willful, but occurred with reasonable grounds for believing that Defendant was in full compliance with the FLSA."  Ans., ¶ 62.**

77. Mr. Cormier testified that he has no facts to show that Jason's Deli's conduct regarding its vehicle reimbursement policy was not willful.  Ex. 9, 73:16-74:13 ("Q.

What facts do you have to support the assertion that any violation should not be found to be willful? [objection omitted] Q. Your answer? A. Again, I don't -- I'm not an expert in FLSA or an attorney; so, I don't know.").

78. Mr. Cormier testified that he has no facts to show that Jason's Deli's conduct regarding its vehicle reimbursement policy has been compliant with the FLSA. *Id.* ("Q. What facts do you have to support the assertion that any violation may have occurred with reasonable grounds for believing that defendant was in full compliance with the FLSA? [objection omitted] Q. Your answer? A. I'm not an expert in FLSA, and I'm not an attorney. I do not know. Q. I'm sorry? A. I do not know.").

79. Mr. Edgerly has no facts to show that Jason's Deli's conduct regarding its vehicle reimbursement policy was not willful. Ex. 10, 107:17-22 ("Q. Sitting here today, are you aware of any facts or documents that would support that assertion that the violation was not willful by Jason's Deli? [objection omitted] A.·I'm not aware of any.").

80. Ms. White, who determined Jason's Deli's vehicle reimbursement rate, has no facts to show that Jason's Deli's conduct regarding its vehicle reimbursement policy was not willful. Ex. 12, 33:18-21 ("Q. What facts do you have that show that any violation of rights afforded by the FLSA was not willful with regard to Jason's

Deli's reimbursement for delivery drivers? [objection omitted] Q. Your answer? A. I have no facts.").

81. Ms. White has no facts to show that Jason's Deli's had reasonable grounds for believing that it was in full compliance with the FLSA. Ex. 12, 34:1-6 ("Q. Okay. What facts do you have to support the statement here that says that Jason's Deli had reasonable grounds for believing it was in full compliance with the FLSA? [objection omitted] A. I have no facts.").

82. See evidence presented in paragraphs 15-76 above.

**Affirmative Defense 4:   "Defendant states that Plaintiffs, and others with whom they are allegedly 'similarly situated' are precluded from recovering any amounts from Defendant because they were paid everything legally due under the FLSA and state laws."  Ans., ¶ 64.**

83. Mr. Cormier does not know of any facts to show that Plaintiffs were paid in compliance with the FLSA. Ex. 9, 75:3-8 ("Q. What facts do you have to show that Jason's Deli's delivery drivers were paid everything legally due under the FLSA? [objection omitted] A. I'm not an expert in FLSA, and I'm not an attorney. I do not know.").

84. Mr. Cormier does not know of any facts to show that Plaintiffs were paid in compliance with state laws. Ex. 9, 75:9-14 ("Q. What facts do you have to show that  Jason's Deli's  delivery drivers were paid everything legally due under state laws? [objection omitted] A. I'm not an expert on state law.  I'm not an attorney.  Do not know.").

85. Mr. Edgerly does not know of any facts which show that Plaintiffs were paid in compliance with the FLSA or state laws.  Ex. 10, 108:5-18 ("Q. Flip   over   to paragraph 64.   Defendant states that Plaintiffs, and others with whom they are allegedly "similarly situated" are precluded from recovering any amounts from Defendant because they were paid everything legally due under the FLSA and state laws.· Are you aware of any facts or other evidence that would support that affirmative defense? [objection omitted] A.· I don't know. Q. Not aware of any facts or evidence that would support that defense? [objection omitted] A.· I'm   not aware.").

86. Mr. Hebert does not have any facts to show that Plaintiffs were paid in compliance with the FLSA.  Ex. 11, 42:24-43:2 ("Q. What facts do you have to support the assertion that any claimant in this lawsuit was paid everything they were legally due under the FLSA? A. I don't have any.").

87. Mr. Hebert does not have any facts to show that Plaintiffs were paid in compliance with state laws.  Ex. 11, 42:3-6 ("Q. What facts do you have to show that any claimant in this lawsuit was paid everything legally due under state laws? A. I don't have any knowledge about it.").

88. Ms. White, who determined the amount of Jason's Deli's reimbursements, does not have any facts to show that Plaintiffs were paid in compliance with the FLSA or state laws.  Ex. 12, 35:7-17 ("Q. What facts do you have to show that any

claimant in this case has been paid everything they were legally due under the Fair Labor Standards Act? A. I have no facts. Q. How about under state law? [objection omitted] A. I have no facts.").

**Affirmative Defense 4: "Defendant alleges that the Complaint, and each purported cause of action contained therein, is barred to the extent the de minimus doctrine applies to Plaintiffs' claims." Ans., ¶ 65.**

89. Mr. Cormier admits that all work time is recorded.  Ex. 9, 76:22-77:2 ("Q. Is Jason's Deli claiming that any amount of time worked by a delivery driver was too small to record as a practical matter? [objection omitted] A.  As it relates to what? I mean, I'm sorry.  All time recorded for pay is -nothing's too de minimis.").

90. Mr. Cormier admits that there is no off-the-clock work time.  Ex. 9, 77:10-13 ("Q. Are you claiming that the delivery drivers perform any work task off the clock? [objection omitted] A. No, sir.").

91.Mr. Cormier does not claim that any work task is too short in length of time to be paid.  Ex. 9, 77:19-23 ("Q. Are you claiming that the delivery drivers perform any task which is too short in length of time to be paid for it? [objection omitted] A. No, sir.").

92.    Mr. Cormier does not believe that it is impractical to record any of the delivery drivers' work time.  Ex. 9, 77:24-78:3 ("Q.    Are you claiming that it's not practical to record any time that the delivery drivers perform work tasks? [objection omitted] A. No, sir.").

93 Mr. Cormier does not have any facts to support Jason's Deli's assertion of the *de minimis* defense.  Ex. 9, 78:4-9 ("Q. What facts do you have to support Jason's Deli's assertion of the de minimus doctrine? [objection omitted] A. I don't know what's in the de minimis doctrine.  I'm not an attorney.  I just don't know.").

94. Mr. Edgerly testified that he does not have any facts to support Jason's Deli's assertion of the *de minimis* defense.  Ex. 10, 108:19-109:10 ("Q.·Paragraph 65, Defendant alleges that the Complaint and each purported cause of action contained therein, is barred to the extent the de minimis doctrine applies to Plaintiffs' claims.· Are you aware of any facts or evidence that support that affirmative defense? [objection omitted] A. I'm not even sure what that means.· So do you want to restate it or -- Q.·Sure.· So de minimis is the notion that the violation is so small that the law won't recognize it. Aware of any facts or evidence that would support that affirmative defense? [objection omitted] A.   I'm not aware.").

**Affirmative Defense 5:   "Defendant states Plaintiffs' complaint is barred in part by all applicable statutes of limitations."  Ans., ¶ 65.**

95. Jason's Deli's has no facts to show that any Plaintiff's claim is untimely.  Ex. 9, 79:19-22 ("Q. Do you know if any claim asserted in the complaint is barred by the Fair Labor Standards Act's statute of limitations? A. No, sir."); Ex. 10, 109:11-16 ("Q.·Paragraph 66, Defendant states Plaintiffs' complaint is barred by all applicable statutes of limitation.· Are you aware of any facts or evidence that would support that affirmative defense? [objection omitted] A.·I'm unaware."); Ex. 11,

44:25-45:4 ("Q. Do you have any facts to show that any of the claims asserted in this lawsuit are barred by any statute of limitations? A. I don't know. I don't have any knowledge of that."); Ex. 12, 37:10-13 (Q. Do you have any facts to show that anybody has waited too long to take legal action in this -- as part of this lawsuit? A. I have no facts.").

**ARGUMENT**

## I.  STANDARD FOR SUMMARY JUDGMENT

One of the "principal purposes" of summary judgment is to isolate and dispose of issues and factually unsupported defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). Without weighing the evidence or determining credibility, the court may grant summary judgment when no genuine issue of material fact exists as to an issue and the movant is entitled to judgment as a matter of law. *Id.*  "Partial summary judgment … serves as a useful tool to streamline litigation by establishing certain issues before trial where there is no genuine issue of material fact." *SEC v. BankAtlantic Bancorp, Inc.,* 661 Fed Appx. 629, 630 n.1 (11th Cir. 2016) (citing Fed. R. Civ. P. 56(d) advisory committee's note to 1946 amendment).

## II. PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL OF THE ISSUES IDENTIFIED BY PLAINTIFFS

### Issue 1:  Plaintiffs May Reasonably Approximate Their Vehicle Costs.

*Every* court to consider the issue has ruled that plaintiffs alleging minimum wage violations resulting from under-reimbursed vehicle costs need not prove, or even

29

know, their actual vehicle costs. Rather, courts determine that these claims are proven through estimates and expert vehicle costing evidence.

Court after court has held that Plaintiffs' claims may be shown through reasonable estimations of actual vehicle costs. *Wass v. NPC Int'l., Inc. ("Wass I")* recognized that the applicable regulations, specifically 29 C.F.R. § 531.35 ("the Anti-Kickback Rule"), 29 C.F.R. § 531.32(c) and 29 C.F.R. § 778.217(a)(3), together prohibit the cost of "tools of the trade," such as vehicle costs incurred in performing a job, from "cut[ting] into the minimum wage or overtime wages required" under the FLSA. 688 F.Supp.2d 1282, 1284-87 (D. Kan. Mar. 2, 2010). *Wass I* concluded that these regulations permit a plaintiff to rely on an estimate of his vehicle costs to support his claim. *Id.* In particular, *Wass I* recognized that 29 C.F.R. § 778.217(a)(3), incorporated by reference into "the Anti-Kickback Rule," permits reliance on a "reasonably approximate [] amount of expenses." *Id.*

In *Darrow v. WKRP Mgmt. ("Darrow I"),* the plaintiffs, like here, alleged that their under-reimbursed vehicle costs caused their net wages to fall below the minimum wage. 2011 U.S. Dist. LEXIS 59388, *1-2 (D. Colo. Jun. 3, 2011). That court considered the issue of "whether an estimate of Plaintiff's vehicle-related expenses is factually sufficient to serve as the basis for a claim." *Id.*, at *9-15. *Darrow I* recognized that "FLSA plaintiffs can rely on estimates provided that there is evidence that the estimate is not an unreasonable approximation of the actual

figure." *Id.* citing *Bledsoe v. Wirtz,* 384 F.2d 767, 771 (10th Cir. 1967); *Robinson v. Food Serv. of Belton, Inc.,* 415 F.Supp.2d 1232, 1235 (D. Kan. 2005). The court further recognized that "[i]n almost factually identical cases, other courts have found that '[i]t is not implausible to suggest that drivers may be able to estimate their expenses without knowing their actual expenses incurred.'" *Id.*, at *10 (citing *Wass II,* 2010 U.S. Dist. LEXIS 141978, *12 (D. Kan. Sept. 1, 2010); *Perrin v. Papa John's Int'l., Inc. ("Perrin I"),* 818 F.Supp.2d 1146, 1149 (E.D. Mo. Mar. 8, 2011) (same)). Based on these precedents, *Darrow I* concluded that a plaintiff may rely on the IRS standard business mileage reimbursement rate. *Id.*, at *11-14 ("Plaintiff may use an estimate of his vehicle-related expenses ***as a fact to support his claims***."). The defendant in *Darrow I* further argued that the plaintiff must document his actual vehicle costs. *Id.*, at *14. But that court held that "documentation is not a necessary component to sustain this FLSA claim" and that "[p]laintiff may use an estimate of his vehicle-related expenses as a fact to support his claims…" *Id.*

Along the same vein, *Smith v. Pizza Hut, Inc. ("Smith I")* reinforced *Darrow I*'s holding "that Plaintiff may rely on a reasonable estimate of his vehicle-related expenses without knowing his exact expenses." 2011 U.S. Dist. LEXIS 76793, at *11-12 n.4 (D. Colo. Jul. 14, 2011). *Perrin I* followed *Wass I* in finding that plaintiffs could base their vehicle reimbursement claims on estimates to be determined by an expert. 818 F.Supp.2d at 1146-1153. And a later opinion in *Wass* expressly

recognized the "consistent rejection of the argument that a driver must know his actual expenses incurred." *Wass v. NPC Int'l., Inc. ("Wass II"),* 2011 U.S. Dist. LEXIS 32761, *9 (D. Kan. Mar. 28, 2011).

By early 2012, one district court had become so tired of employers arguing that plaintiffs must know and/or prove their actual vehicle expenses to prevail, that it threatened to sanction a defendant for again asserting that argument. *Darrow v. WKRP Mgmt., LLC ("Darrow II")*, 2012 U.S. Dist. LEXIS 242997, *15 & n. 10 (D. Colo. Feb. 28, 2012). That court first held:

> Defendants assert that "[i]f Plaintiffs do not know their actual expenses, it is axiomatic that they cannot establish that those expenses resulted in their wages falling below the minimum wage." (Doc. # 153 at 12.) ***This argument has no merit*** for two reasons… As the Court has already determined, Plaintiffs may rely on reasonable estimates of their vehicle-related expenses as the factual basis of their FLSA claim. (Doc. # 144 at 12.)

*Id.*, at *10 (emphasis added). *Darrow II* then expressly warned the defendants to stop raising the rejected argument that plaintiffs must prove actual vehicle expenses: "Defendants' attempt to re-litigate issues that have already been decided wastes the Court's limited resources, causes unnecessary delay, needlessly increases the cost of litigation for Plaintiffs, and may lead to sanctions if Defendants persist in making arguments that have already been rejected by the Court. See Fed. R. Civ. P. 11(b)." 2012 U.S. Dist. LEXIS, at *15 n.10.

A later holding in *Perrin* further reinforced these consistent opinions in granting class certification of five state-wide class actions pursuant to the more-stringent Rule 23 standard. *Perrin v. Papa John's Int'l., Inc. ("Perrin II"),* 2013 U.S. Dist. LEXIS 181749 (E.D. Mo. Dec. 31, 2013). In *Perrin II*, the employer again argued that the plaintiffs could not fulfill the "predominance requirement of Rule 23(b)(3) "because to prove their prima facie case, Plaintiffs will need to show that their individual vehicle expenses exceeded the delivery-related vehicle reimbursements." *Id.*, at *20. *Perrin II*, like all the earlier cases, relied on the same regulations to reject the pizza companies argument:

> Pursuant to 29 C.F.R. § 778.217(a), "if the amount of the reimbursement ***reasonably approximates*** the expenses incurred" payments made by an employer to cover expenses, such as the vehicle expenses at issue here, are not considered in determining the employee's effective hourly rate for purposes of the FLSA and the state wage laws. The regulations further provide that the "actual or ***reasonably approximate amount*** of the expense is excludable" for purposes of determining the effective hourly rate. Id. § 778.217(c).

2013 U.S. Dist. LEXIS 181749, at *21-22 (emphasis added). *Perrin II* then summarized the applicable law:

> Under the regulations "an employer [may] approximate reasonably the amount of an employee's vehicle expenses without affecting the amount of the employee's wages for purposes of the federal minimum wage law." *Wass v. NPC Int'l., Inc.,* 688 F.Supp.2d 1282, 1285-86 (D. Kan. 2010). However, if the employer's approximation is unreasonable, the employee may have a claim that his wage rate was reduced below minimum wage as a result of the insufficient reimbursement. *Id.* at 1287; *Smith v. Pizza Hut, Inc.,* No. 9-cv-01632-CMA-BNB, 2011 WL 2791331, at *4 (D. Colo. July 14); *Darrow v. WKRP Mgmt. LLC,* No.

09-CV-01613, 2011 WL 2174496, at *3-4 (D. Colo. June 3). ***In proving such a claim, a plaintiff may rely on a reasonable estimate of his vehicle-related expenses and need not show his actual expenses***. *Darrow*, 2011 WL 2174496, at *4 (citing cases); *Smith* 2011 WL 2791331, at *4 n.4.

2013 U.S. Dist. LEXIS 181749, at *22-23 (emphasis added). *Perrin II* further held that "Defendants' assertion that individualized showings of each Plaintiff's vehicle expenses will be required to prove Plaintiffs' claims is **without merit** [because] Defendants' own reimbursement methodology does not depend upon the drivers' actual expenses and the regulatory framework does not require that reimbursement be based on actual expenses." *Id.*, at *24 (emphasis added).

In limiting defendant's requested discovery, *Perrin v. Papa John's Int'l., Inc. ("Perrin III")*, later reinforced that "'Defendants' assertion that individualized showings of each Plaintiff's vehicle expenses will be required to prove Plaintiffs' claims *is **without merit***' because 'Defendants' own reimbursement methodology does not depend upon the drivers' actual expenses and the regulatory framework does not require that reimbursement be based on actual expenses.'" 2014 U.S. Dist. LEXIS 133974, *5 (E.D. Mo. Sept. 24, 2014) (quoting that Court's earlier opinion). *Perrin III* further recognized that these claims can be proven through class-wide expert testimony based on estimated vehicle costs. For example, *Perrin III* anticipated that each side would produce an expert report that "will presumably demonstrate whether the reimbursement formula used by Defendants is or is not a

reasonable approximation of Plaintiffs' vehicle expenses." 2014 U.S. Dist. LEXIS 133974, at *12.

In granting class certification, *Villalpando v. Exel Direct Inc. ("Villalpando I")* likewise found that damages in a claim for unreimbursed vehicle costs "can be addressed through common proof, namely, the opinions of Plaintiffs' expert as to hours driven by class members and the applicable rate." 2016 U.S. Dist. LEXIS 53773, *45 (N.D. Cal. Apr. 21, 2016). The *Villalpando* plaintiffs proposed to "rely on the opinions of their experts as to the estimated amounts of these expenses for class members." *Id., at* *58 (N.D. Cal. Apr. 21, 2016). The defendant challenged the plaintiffs' reliance on estimates of vehicle costs rather than actual vehicle costs. But, *Villalpando I* rejected that defendant's challenge because "…the absence of complete and accurate information is a result, at least in part, of Exel's failure to maintain records of these expenses and therefore Plaintiffs may prove these expenses as a matter of reasonable inference." *Id.*, at *61. *Villalpando I* further recently expressly rejected that employer's "assertion that [a vehicle costing expert's] cost estimates are unreliable simply because they are not based on investigation of the class members' actual costs through, for example, a review of their receipts." *Id.*, at *64.

In *Drollinger v. Network Global Logistics, Inc.,* 2016 U.S. Dist. LEXIS 171013 (D. Colo. Dec. 8, 2016), defendants sought to strike an expert's report because the

expert relied on estimates of vehicle costs, rather than actual vehicle costs, to show

minimum wage violations. That court soundly rejected such contention:

> Defendants' argument that Mr. Lauria's testimony is not relevant because it is based on estimates and not the actual costs incurred by Plaintiff and other employees of Defendants fails. This District has made clear that "FLSA plaintiffs can rely on estimates provided that there is evidence that the estimate is not an unreasonable approximation of the actual figure." *Darrow v. WKRP Mgmt.,* No. 09-cv-01613-CMA-BNB, 2011 WL 2174496, at *4 (D. Colo. June 3) (citations omitted). The key here is that Defendants argue that "Plaintiffs can only [prevail on class certification] by demonstrating that the reimbursement provided by MLS was insufficient to cover the actual expenses they incurred in operating their personal vehicles on behalf of MLS." (Docket No. 61 at 5). However, Defendants offer no legal support for this position. The closest they come is to show that there is a several thousand dollar difference in the estimated costs for the maintenance and repairs of opt-in Plaintiff Coffelt's vehicles and the actual costs reported by Ms. Coffelt in her deposition. (Docket No. 61 at 8). However, Defendants do not argue that $5,122 "is not an unreasonable approximation of the actual figure." *Darrow,* 2011 U.S. Dist. LEXIS 59388, 2011 WL 2174496, at *4. Further, Defendants offer no legal support for their position that the use of estimates renders Mr. Lauria's testimony irrelevant. While Defendants make the point that Mr. Lauria does not offer an expert opinion regarding the costs actually incurred by Plaintiff or any other employee of Defendants (Docket No. 61 at 5-6), the fact that the expert's opinion is based on estimates does not render it irrelevant and, therefore, subject to preclusion under Rule 702.

2016 U.S. Dist. LEXIS *3-5, objections overruled at *Drollinger v. Network Global*

*Logistics, Inc.,* Case No. 16-cv-00304-MSK-MJW (D. Colo. Jan. 18, 2017).

Within this Circuit, *Sullivan v. PJ United, Inc.* recently held that "***Sullivan could***

***reasonably approximate expenses incurred on behalf of any employer***." 2018 U.S.

Dist. LEXIS 143246, *27-28 (N.D. Ala. Jul. 19, 2018) (emphasis added).

Just last week, in *Ashton v. PJ Louisiana, Inc.*, an arbitrator considering the same decisions reached the same conclusion that a claimant may support his or her claims with *estimated* vehicle costs.  AAA Case No.  01-17-0006-8180 (Ex. 15), at 3-8.

Based on these numerous consistent precedents, the Court should grant summary judgment finding that Plaintiffs may prove their claims through estimated vehicle costs, and they need not prove their actual vehicle costs.

**Issue 2:   Jason's Deli Must Reimburse A Portion of the Fixed Costs of Driving / the Applicable Test for Reimbursement is Whether an Employer "Tends to Shift" Business Costs to Employees**

Jason's Deli must reimburse for fixed costs of driving, including insurance, to the extent those costs reduce net wages below the minimum pursuant to (a) controlling Eleventh Circuit law, (b) the express language of the U.S. Department of Labor's ("DOL's") "anti-kickback regulation," (c) the DOL's interpretative guidance, and (d) the law applicable to minimum wage claims based on under-reimbursed vehicle costs.

**A. Payments That "Tend to Shift" Part of an Employer's Business Expense to Employees Must Be Reimbursed.**

The standard is set forth in the "anti-kickback rule" and was recognized in the first controlling decision, namely *Mayhue's*.  Before the Fifth Circuit split into the Eleventh and Fifth Circuits, the Fifth Circuit held that an employee-paid expense constitutes a "kick back" if it "***tend[s] to shift part of the employer's business expense to the employees***." *Id.* at 1199 (emphasis added). In so holding, *Mayhue's*

interpreted and applied the language of 29 C.F.R. § 531.35, commonly known as the "anti-kickback regulation," stating that "[t]he wage requirements of the Act will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person *for the employer's benefit* the whole or part of the wage delivered to the employee." 464 F.2d at 1199 (quoting 29 C.F.R. § 531.35 (emphasis added)). *Mayhue's* recognized that "these regulations are entitled to controlling weight." *Id.* at 1199 (citing *Schultz v. Hinojosa,* 432 F.2d 259 (5th Cir. 1970)).[1]

The Eleventh Circuit's decision in *Ramos-Barrientos v. Bland* is the second controlling precedent. 661 F.3d 5887, 574-95 (11th Cir. 2011). The Eleventh Circuit re-emphasized *Mayhue's* holding that 29 C.F.R. § 531.35 "prohibits any arrangement that 'tend[s] to shift part of the employer's business expense to the employees … to the extent that it reduce[s] an employee's wage below the statutory minimum.'" 661 F.3d 587, 594-95 (11th Cir. 2011) (edits in original) (quoting *Mayhue's*, 464 F.2d at 1199). Thus, both the pre-split Fifth Circuit and the Eleventh Circuit have both rejected a standard for reimbursement which would require reimbursement only if the expense was incurred "primarily" or "solely" for the employer's benefit.

---

[1] *See also, Castellanos-Contreras v. Decatur Hotels, LLC*, 559 F.3d 332, 338 (5th Cir. 2009) (holding that an employee-paid expense is "primarily for the employer's benefit" when it "shifts an employer's business expense to the employee.").

In *Sullivan,* the employer recently argued that a cost must be reimbursed only if it is expended for the employer's "primary benefit" or "solely by reason of action taken for the convenience of [the] employer." 2018 U.S. Dist. LEXIS 143246, at *29. However, *Sullivan* soundly rejected those arguments, finding that the "tends to shift" standard established in *Mayhue's Super Liquor Store,* as followed by the Eleventh Circuit in *Ramos-Barrientos v. Bland,* 661 F.3d 587, 594-95 (11th Cir. 2011), governs an employer's duty to reimburse vehicle costs. 2018 U.S. Dist. LEXIS 143246, at *28-37.

Last week, applying the same Eleventh Circuit law, *Ashton* likewise held that the applicable test is whether an employer "tends to shift" its costs to its employees.  Ex. 15, at 8-11.

Jason's Deli is clearly shifting the costs of providing and insuring their delivery vehicles by requiring their delivery drivers use their personal vehicles and to purchase insurance to perform their jobs. Thus, following *Mayhue's, Ramos-Barrientos* and *Sullivan,* the Court should grant summary judgment, finding that Jason's Deli must reimburse a portion of fixed vehicle costs, including but not limited to, vehicle insurance.

## B.   The DOL Demands Reimbursement for Fixed Vehicle Costs Including Insurance.

Section 30c15 of the DOL Handbook interprets the "anti-kickback regulation," 29 C.F.R. § 531.35, in the specific context of reimbursing vehicle costs paid by

"*delivery drivers employed by pizza or other carry-out type restaurants.*" That authority advises that employers may either (a) track and reimburse actual vehicle costs or (b) reimburse at the IRS rate.  *Id.*  The DOL further recognizes that "[t]he IRS standard business mileage rate … represents **depreciation**, **maintenance and repairs**, gasoline (including taxes), oil, **insurance, and vehicle registration fees**." *Id.* (emphasis added).  Depreciation, maintenance and repairs, insurance and vehicle registration fees are all fixed costs of driving.  *Id.*; Ex. 14, at 25, 35-38.

The Eleventh Circuit has found that the DOL Handbook is "persuasive, even though it is not entitled to Chevron deference." *Morgan v. Family Dollar Stores,* 551 F.3d 1233, 1275 n.65 (11th Cir. 2008); *Klinedinst v. Swift Invs., Inc.,* 260 F.3d 1251, 1255 (11th Cir. 2001).  The Eleventh Circuit has also held that "'[a]n agency's interpretation of its own regulations is 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Harrison v. Ocean Bank,* 614 Fed Appx. 429, 437 (11th Cir. 2015) (quoting *Sierra Club v. Johnson,* 436 F.3d 1269, 1274 (11th Cir. 2006) (quoting *Auer v. Robbins,* 519 U.S. 452, 461 (1997)).  Section 30c15 of the DOL Handbook is clearly interpreting the DOL's own regulations, specifically 29 C.F.R. §§ 531.35, 29 C.F.R. § 531.32(c), and 778.217. Thus, the Court should afford controlling weight to DOL Handbook § 30c15.

### C. Vehicle Ownership, Delivery Drivers' Purchase of Vehicles, and Insurance Based on State Laws and Finance Company Requirements Are Irrelevant.

Jason's Deli may argue that it need not reimburse for fixed costs of driving, such as insurance, because its delivery drivers would purchase vehicles and auto insurance regardless of their employment. But, that argument was soundly rejected in *Sullivan* and does not follow the applicable "tends to shift" standard:

> Defendants have shown that some former Opt-in Plaintiffs did not in fact own the vehicles that they used to deliver pizzas. (*See Id.* ¶ 15 (purporting to list the former Opt-in Plaintiffs and other documents in the record which establish that the former Opt-in Plaintiffs do not own the vehicles used for pizza deliveries).) Defendants have likewise referenced statements by some former Opt-in Plaintiffs that finance companies required vehicle insurance, state law requires insurance and vehicles to be registered. (*Id.* ¶¶ 19-21, 25-27.) ***None of these facts are helpful in answering the dispositive question of whether Defendants have shifted part of their business expenses to Sullivan****.* Thus questions of fact remain as to whether these costs or some portion of these costs have been shifted from the employer to employees.

(Doc. 304, at 33-34 (emphasis added)). Thus, any and all evidence of Plaintiffs' vehicle ownership or non-ownership, finance company requirements, and state insurance and registration laws is wholly irrelevant because, as *Sullivan* holds, "[n]one of these facts are helpful in answering the dispositive question of whether [Jason's Deli] ha[s] shifted part of [its] business expenses" to Plaintiffs. *Id.*

In *Perrin III*, Papa John's argued on summary judgment that fixed costs of driving, which included vehicle insurance and other costs, need not be reimbursed because such costs are incurred regardless of employment. *Perrin v. Papa John's*

*Int'l. ("Perrin III"), Inc.,* 114 F.Supp.3d 707, 729-30 (E.D. Mo. 2015). *Perrin III* recognized that the "regulatory guidance and industry practice reveals a general acceptance that at least a portion of such fixed costs [including vehicle insurance] are for the benefit of the employer, and are thus properly reimbursable expenses under the FLSA." *Id*. at 730. *Perrin III* recognized that it "makes logical sense" for employers to "reimburse their drivers for a portion of their fixed vehicle expenses" as "courts have decided that, for the purposes of determining minimum wage compliance, expenses incurred for the benefit of the employer include costs that are 'essential for the . . . employment relationship to come to fruition.'" *Id*. (emphasis added) (citing *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 898 (9th Cir. 2013)). Next, *Perrin III* recognized that "having a safe, clean, and legal vehicle is as necessary for Plaintiffs to be employed as drivers, as it is for Defendants to maintain a delivery operation without its own fleet of vehicles." *Id; compare* SOF ¶¶ 5-16. Thus, *Perrin III* found that all vehicle costs, including the required insurance, are necessary to perform the job, and therefore such costs must be reimbursed. *Id.* Again, these authorities show that summary judgment is warranted.

**Issue 3:      Tips Do Not Count Toward the Minimum Wage**

**A.     Tips Exceeding a the Amount of a Lawfully-Invoked Tip Credit Cannot Offset Minimum Wage Deficits.**

All attempts to claim the benefit of tips received in excess of a validly invoked tip credit have been uniformly rejected in minimum wage claims, including claims

by food delivery drivers alleging minimum wage violations resulting from under-reimbursed vehicle costs.  Here, Jason's Deli admits that it invoked no tip credit. SOF ¶ 19.  Therefore, it is barred as a matter of law from asserting any minimum wage "cushion" based on tips received by its drivers.

The most comprehensive explanation was set forth in *Perrin III.* 114 F. Supp. 3d at 728-29. The court granted summary judgment against Papa John's where it sought the benefit of the maximum tip credit of $5.12 per hour, although it took tip credits less than the maximum. *Id.*

A "tip credit" refers to "an additional amount based on the tips received by the employee that is equal to the difference between the cash wage and the current rate required by 29 U.S.C. § 206(a)(1) ($7.25 per hour)." *Perrin III,* 114 F. Supp. 3d at 728 (citing *Fast,* 638 F.3d at 876); 29 U.S.C. § 203(m)). That amount "allows the employer to avoid a larger cash payment to the employee as long as the employee's tips make up the difference between $2.13 per hour and the current minimum wage." *Id.* (citing *Fast,* 638 F.3d at 876).

*Perrin III* observed that the tip credit comes with "conditions." First, pursuant to 29 U.S.C. § 203(m), the tip credit "shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee." *Id.* at 728 (citing 29 U.S.C. § 203(m)). "This notice

provision is strictly construed and normally requires that an employer take affirmative steps to inform affected employees of the employer's intent to claim the tip credit." *Id.* (citing *Perez v. 'Lorraine Enterpr., Inc.,* 769 F.3d 23, 27 (1st Cir. 2014)). The regulations further prohibit employers from claiming a tip credit unless they have informed employees in advance of "[t]he amount of the cash wage that is to be paid to the tipped employee by the employer [and] the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer…". *Perrin III,* 114 F.Supp.3d at 728-29 (quoting 29 C.F.R. § 531.59(b)).

*Perrin III* granted summary judgment for the plaintiffs because it was undisputed that Papa John's never notified its delivery drivers that it would take a tip credit greater than the difference between the plaintiffs' cash wage and the applicable minimum wage rate. *Id. Perrin III* concluded:

> Although the Plaintiffs do not raise overtime claims in this litigation, the Court agrees with Plaintiffs that the relationship among the FLSA's tip credit, minimum wage, and overtime provisions highlights the importance of the FLSA's tip credit notice requirements. By limiting their tip credit to the difference between Plaintiffs' cash wage and the applicable minimum wage, and so notifying Plaintiffs, Defendants were permitted to similarly limit Plaintiffs' regular rate of pay for overtime purposes to minimum wage. Had Defendants taken a higher tip credit to offset against potential unreimbursed expenses, as they claim the DOL guidance documents allow, this would have increased Plaintiffs' regular rate of pay and, correspondingly, increased the amount Defendants owed Plaintiffs for overtime.

44

114 F. Supp. 3d at 729; *see also, U.S. Dept. of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 780 (6th Cir. 1995) (rejecting the argument that employer can claim maximum tip credit in litigation when it only took smaller tip credit).

Another district court recently considered, and soundly rejected, another food delivery company's argument that all tips are considered in determining a minimum wage violation in the same claim by pizza delivery drivers alleging minimum wage violations resulting from under-reimbursed vehicle costs. *Meetz v. Wisconsin Hospitality Grp. LLC,* 2017 U.S. Dist. LEXIS 138380, at *14-15 (E.D. Wis. Aug. 29). In that case, the employer took a $2.00 per hour tip credit to achieve the minimum wage. *Id.* at *3. The employer argued that tips in excess of the amount of the tip credit actually taken offset any deficiencies in the payment of the federal minimum wage resulting from under-reimbursed vehicle costs. *Id.* at *14-15. *Meetz* recognized that "[a]lthough an employer may use a tip credit to count an employee's tips toward the employer's minimum wage obligations, the employee must receive advance notice of the tip credit." *Id.* (citing 29 U.S.C. § 203(m); 29 C.F.R. 531.59(b); *Perrin III,* 114 F. Supp. 3d at 727 ("Defendants may not claim a tip credit in an amount greater than the difference between Plaintiffs' cash wage and minimum wage because they failed to notify Plaintiffs in advance that they were doing so.").

Accordingly, *Meetz* held that the employer "may not rely on … tips in excess of the tip credit to offset any deficiencies in his receipt of the federal minimum wage

arising from under-reimbursement of his vehicle expenses as a result of Defendants'
alleged unreasonable approximation of his actual expenses." *Id.*; *see also McFarlin
v. Word Enterpr., LLC,* 2018 U.S. Dist. LEXIS 46212, at *5-13 (E.D. Mich. Mar.
21, 2018) (reaching same conclusion on summary judgment in same claim against a
food delivery company); *Bass v. PJCOMN Acq. Corp.,* 2011 U.S. Dist. LEXIS
58359, at *3 (D. Colo. June 1, 2011) (denying summary judgment when employer
argued that all tips count toward minimum wage); *see also Bass v. PJCOMN Acq.
Corp.,* Case No. 09–cv–01614–REB–MEH (D. Colo.) (ECF Doc. 35 at p.11, ¶26
and p.12, ¶27; Doc. 51, p.8-8; Doc. 56, pp. 2-3; Doc. 67, pp. 2-3) (arguments to court
about whether all tips do or do not count toward minimum wage); *see also Ashton,*
(Ex. 15), at 11-12 (granting summary judgment for claimant on the basis that tips in
excess of amount of tip credit do not count toward minimum wage compliance).

All other courts to consider the same issue of whether tips can offset minimum
wage violations have uniformly reached the same conclusion. *See, e.g., Martin v.
Tango's Rest., Inc.*, 969 F.2d 1319, 1323 (1st Cir. 1992) ("It may at first seem odd
to award back pay against an employer, doubled by liquidated damages, where the
employee has actually received and retained base wages and tips that together amply
satisfy the minimum wage requirements" but that result was prescribed by
Congress); *Lanzetta v. Florio's Enters.*, 763 F. Supp. 2d 615, 623 (S.D.N.Y. 2011)
(refusing to consider employer's argument that tips provided employee minimum

wage "ten times over"); *Bernal v. Vankar Enterprises, Inc.*, 579 F. Supp. 2d 804, 810 (W.D. Tex. 2008) (holding that where defendant "deducted losses due to cash register shortages and unpaid tabs" from employee's paycheck or tips, it was not entitled to tip credit as offset to minimum-wage claim); *Chisolm v. Gravitas Rest. Ltd.*, 2008 U.S. Dist. LEXIS 28254, *11-12 n.12 & 15 (S.D. Tex. Mar. 25, 2008) ("The FLSA provides that an employer who violates its minimum wage provisions be liable in the full amount of the minimum wage…" when an employer deducts the cost of "tools of the trade"); *Chan v. Sung Yue Tung Corp.*, 2007 U.S. Dist. LEXIS 7770, *53 (S.D.N.Y. Feb. 1, 2007) (holding that tips are gifts from customers, not wages); *Chan v. Triple 8 Palace, Inc.,* 2006 U.S. Dist. LEXIS 15780, *38-39 (S.D.N.Y. Mar. 30, 2006); *Harrell v. Diamond A Entm't., Inc.*, 992 F. Supp. 1343, 1357-58 (M.D. Fla. 1997) (rejecting defendants' argument that entertainers who received as much as $1,000.00 per week in tips do not need minimum wage protection and holding that funds received from customers are tips, not wages, which cannot offset employer's obligation to pay minimum wage); *Bonham v. The Cooper Cellar Corp.*, 476 F. Supp. 98, 102 (E.D. Tenn. 1979) (refusing to allow employer to credit tips against minimum wage absent tip credit "despite [the] plaintiff's admissions that their actual income, including tips, greatly exceeded the minimum wage for the relevant period" and finding violations because wages, without considering tips, were below minimum wage); *see also, e.g.*, *Reich v. Chez Robert*,

28 F.3d 401, 404 (3rd Cir. 1994) (holding that district court erred in crediting tips against FLSA minimum wage damages in claim that unreimbursed job expenses caused minimum wage deficiencies).

Moreover, *Sullivan* recently reached the same conclusion. 2018 U.S. Dist. LEXIS 143246, at *62-68. It held that, "[t]o the extent that Defendants may subsequently argue that the amount of tips—in excess of the amount of (1) cash wage and (2) tip credit paid—can be used in a post hoc fashion to offset Sullivan's vehicle costs so that a minimum wage violation does not occur, that argument is foreclosed by § 203(m) and DOL regulations." *Id.*

Following this long line of consistent authorities, Jason's Deli cannot receive any credit for tips received toward its delivery drivers' minimum wages because it admittedly took no tip credit.  Therefore, summary judgment is warranted.

### Issue 4:    Jason's Deli's Affirmative Defenses Fail Either as a Matter of Law of Due to Insufficient Evidence

It is axiomatic that a party asserting an affirmative defense holds the burden of proving that defense. *See, e.g., U.S. v. Vernon,* 723 F.3d 1234, 1269 (11th Cir. 2013).

### A. Jason's Deli's "*De Minimis*" Defense (Fourth Affirmative Defense).

Summary judgment should be granted on Jason's Deli's "*de minimis*" defense (fourth affirmative defense) because that defense is inapplicable to minimum wage claims.  Summary judgment should also be granted on Jason's Deli's first and third affirmative defenses because they are not affirmative defenses.

The FLSA's *de minimis* affirmative defense is set forth in 29 C.F.R. § 785.47:

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. (*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)). This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him. *See Glenn L. Martin Nebraska Co. v. Culkin*, 197 F.2d 981, 987 (C.A. 8, 1952), cert. denied, 344 U.S. 866 (1952), rehearing denied, 344 U.S. 888 (1952), holding that working time amounting to $1 of additional compensation a week is 'not a trivial matter to a workingman,' and was not de minimis; *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 95 (C.A. 2, 1953, cert. denied 346 U.S. 877, holding that 'To disregard workweeks for which less than a dollar is due will produce capricious and unfair results.' *Hawkins v. E.I. du Pont de Nemours & Co.*, 12 W.H. Cases 448, 27 Labor Cases, para. 69, 094 (E.D. Va., 1955), holding that 10 minutes a day is not de minimis.

29 C.F.R. § 785.47 (emphasis added); *see also, e.g., Chao v. Tyson Foods, Inc.,* 568 F.Supp.2d 1300, 1321 (N.D. Ala. 2008) ("29 C.F.R. § 785.47 provides for application of the *de minimis* defense 'only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities.'"); *Sanchez v. Bland Farms, LLC,* 2011 U.S. Dist. LEXIS 67075, at *25 (S.D. Ga. Jun. 16, 2011) (same). The employer holds the burden of proving the *de minimis* defense. *See, e.g., Rodriguez v. Nike Retail Servs.,* 2017 U.S. Dist. LEXIS 147762, at *15 &

33-34 (N.D. Cal. Sept. 12, 2017); *Rikard v. U.S. Auto Prot.,* 2013 U.S. Dist. LEXIS

149380, at *13 (E.D. Mo. Oct. 17, 2013); *Arnold v. Schreiber Foods, Inc.*, 690

F.Supp.2d 672, (M.D. Tenn. 2010).

In granting summary judgment on the same claim against another food delivery

company, *Sullivan* soundly ruled that that such "*de minimis*  defense" does not apply

to these claims:

> Defendants do not cite any authority for their novel take on the de
> minimis defense. While not binding on this Court, at least one other
> district court faced with Defendants' argument found no basis in law to
> support it. See *Wagner v. ABW Legacy Corp, Inc.,* No. CV-13-2245-
> PHX-JZB, 2016 WL 880371, *16 (D. Ariz. Mar. 8) ("Defendant's 'de
> minimis' argument does not establish that Defendant is entitled to
> summary judgment. Defendant does not cite to any authority to support
> the contention that it can escape paying shortfalls in minimum wage
> payments because the shortfalls are 'de minimis.' Further, Defendant
> does not address any of the three factors it identifies as part of the de
> minimis analysis, nor is there sufficient evidence before the Court to
> assess these factors."). As with the defendants in *Wagner* Defendants
> appear to raise a de minimis defense for their possible failure to pay an
> hourly rate at or above the federal minimum wage. The de minimis
> defense is only meant for instances where an employer has failed to
> compensate an employee for a small, hard-to-calculate period of time,
> not where the time the employee worked is certain, but the employer's
> hourly rate is below the minimum wage.

2018 U.S. Dist. LEXIS 143246, at *50-53; *see also, e.g., Rikard,* 2013 U.S. Dist.

LEXIS 149380, at *14-17 (rejecting attempt to rely on a *de minimis* defense based

on similar reasoning); *see also Ashton* (Ex. 15), at 1-15 (granting summary judgment

for claimant on the basis that the *de minimis* defense does not apply in a minimum

wage claim based on unreimbursed vehicle costs).

Moreover, even if the actual *de minimis* defense set forth in 29 C.F.R. § 785.47 applied to Plaintiffs' minimum wage claims, Jason's Deli admits that its lacks evidence to support such a defense.  It admits that all work time is recorded, that no off-the-clock work time has occurred, no work task is too short in length to go unpaid, it is not impractical to record any of the delivery drivers' work time, and it has no facts to support the *de minimis* defense.  *See* SOF ¶¶ 89-94.

Thus, summary judgment should be granted because the *de minimis* defense fails to apply, and, even if it did apply, Jason's Deli admits that it lacks facts needed to prove the *de minimis* defense.

## B. Jason's Deli's Lacks Evidence to Prove "Good Faith and Reasonable Grounds" to Believe that it Has Not Violated the FLSA

Section 16(b) of the FLSA, 29 U.S.C. § 216(b), provides that "[a]ny employer who violates the provisions of section 206 [minimum wages] or section 207 [overtime wages] of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, *and in an additional equal amount as liquidated damages*."  *Id.* (emphasis added).  Section 11 of the Portal-to-Portal Act, 29 U.S.C. § 260, further provides that "[i]n any action . . . to recover . . . unpaid overtime compensation, or liquidated damages, under the [FLSA] . . ., if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission

was not a violation of the [FLSA] . . . , the court may, in its sound discretion, award no liquidated damages or award any amount thereof …" *Id.* If the employer fails to prove that he acted with both subjective and objective good faith, 'liquidated damages are mandatory.'" *Davila v. Menendez,* 717 F.3d 1179, 1186 (11th Cir. 2013) (quoting *Dybach v. Fla. Dep't. of Corr.,* 942 F.2d 1562, 1567 (11th Cir. 1991)).

"To satisfy the subjective 'good faith' component, the employer has the burden of proving that it had an honest intention to *ascertain what the Act requires* and to act in accordance with it." *Dybach,* 942 F.2d at 1566 (emphasis added); *Davila,* 717 F.3d at 1186 (quoting *Dybach*); *Arias v. Alpine Towing, Inc.,* 2011 U.S. Dist. LEXIS 38154, *4 (S.D. Fla. Mar. 30, 2011) ("The standard set forth in *Dybach* requires a showing of intention to ascertain the law, not just an honest belief that the defendants acted in accordance with the law."); *id.*, at *5 ("the law requires the defendants show what actions they took to ascertain this belief") (citing *Barcellona v. Tiffany English Pub,* 597 F.2d 464, 469 (5th Cir. 1979) (explaining that food faith "requires some duty to investigate potential liability under the FLSA") (citing *Dybach,* 942 F.2d at 1566). This District recently characterized the employer's burden to prove the "good faith and reasonable grounds" defense to liquidated damages as a "substantial burden." *Green v. Premier Telcom. Servs., LLC,* 2017 U.S. Dist. LEXIS 213542, *53 (N.D. Ga. Aug. 15, 2017).

None of the company executives and managers that Jason's Deli identified as having knowledge of its vehicle reimbursement policy and reimbursement rate have any knowledge of any actions taken by Jason's Deli to determine whether its vehicle reimbursement policy complies with the FLSA, and they are unaware of any documents or sources consulted by Jason's Deli to ascertain what the FLSA requires. *See* SOF ¶¶ 15-62.  None of them have any knowledge about reviewing the FLSA, the DOL's regulations, the DOL's administrative guidance, any DOL order, state wage and hour agency order, court order, DOL interpretation, state wage and hour agency interpretation, administrative practice, enforcement policy, opinion letter or attorney's opinions.  *Id.*; *Compare, e.g., Cooper v. Fulton Cnty.,* 458 F.3d 1282, 1287 (11th Cir. 2006) (affirming a district court's award of liquidated damages due to lack of objective good faith where the employer failed to consult with an attorney, contact the DOL or to review any of the DOL's advisory opinions prior to wrongfully terminating an employee).

Those executives and managers admit across-the-board that they no facts to show Jason's Deli's "good faith" in creating or administering its vehicle cost reimbursement policy.  SOF, ¶¶ 21 - 25.

They further admit lack of efforts by Jason's Deli to determine whether its delivery drivers are reasonably reimbursed.  SOF, ¶¶ 63-65. They admit that Jason's Deli makes no efforts to determine whether its delivery drivers are reasonably

reimbursed. SOF, ¶¶ 73-76. Those executives and managers even admit they do not even know the amount of a reasonable vehicle reimbursement rate.  SOF, ¶¶ 70-72.

The company has not even consulted with any vehicle costing professional for any business purpose.  SOF, ¶ 76.

Jason's Deli's executives and managers even admit that they do not know whether the company's delivery drivers have been reasonably reimbursed for their vehicle costs.  SOF, ¶¶ 66-69.

Thus, summary judgment is clearly warranted as Jason's Deli admits that it lacks evidence needed to prove "good faith and reasonable grounds" to believe that its vehicle reimbursement policy is compliant.  *See, e.g., Ashton* (Ex. 15), at 13-15 (granting summary judgment for claimant on the "good faith" defense because respondent did not, and could not, come forth with evidence to show good faith efforts at compliance).

## C. Jason's Deli's "Lack of Willfulness" and "Compliance with the FLSA" Affirmative Defenses

The same evidence shows that Jason's Deli cannot prove lack of willfulness or compliance with the FLSA.  In addition, Jason's Deli's executives and managers admit that they have no facts to show either that the company's conduct regarding its vehicle reimbursement not willful or compliant with the FLSA. SOF, ¶¶ 77-82. Thus, summary judgment is warranted.

**D. Jason's Deli's "Paid in Accordance with the FLSA" Defense**

Jason's Deli admits that it has no facts to show that Plaintiffs were paid in compliance with either the FLSA or state laws.  SOF, ¶¶ 83-88.  Thus, summary judgment should be granted.

**E. Jason's Deli's "Statute of Limitations / Untimely Claims" Defense**

Jason's Deli likewise admits that its lacks evidence to show any untimely claims. SOF, ¶ 95.  Thus, summary judgment should be granted.

## III. CONCLUSION

For all reasons stated above, partial summary judgment should be granted against Jason's Deli.

Respectfully submitted,

**WEINHAUS & POTASHNICK**
*/s/ Mark Potashnick*
Mark A. Potashnick
11500 Olive Boulevard, Suite 133
St. Louis, Missouri 63141
Telephone:  (314) 997-9150
Facsimile:   (314) 997-9170
markp@wp-attorneys.com

**WEINER & SAND**
Andrew Weiner (GA Bar #808278)
3525 Piedmont Road
7 Piedmont Center, 3rd Floor
Atlanta, Georgia 30305
Telephone:  (404) 254-0842
Facsimile:  (866) 800-1482

**PAUL LLP**
Richard M. Paul III
Sean R. Cooper
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile:   (816) 984-8101
Rick@PaulLLP.com
Sean@PaulLLP.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The foregoing was served on Defendants' attorneys of record via the Court's electronic case filing system on November 30, 2018.


*/s/ Mark Potashnick*