# EXHIBIT 14

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| NIAL BENTON and HUTTON GRAHAM, individually and on behalf of similarly situated persons, | * | |
| | * | |
| | * | Civil No. 1:17-cv-00296-WSD |
| Plaintiff, | * | |
| v. | * | |
| DELI MANAGEMENT, INC. d/b/a "JASON'S DELI," | * | |
| | * | |
| Defendant. | * | |
| | ****** | |

## EXPERT REPORT OF PAUL T. LAURIA

I have been retained by the Plaintiffs in the above-styled case to provide expert opinions on issues relevant to the case. This report constitutes a complete statement of all opinions I have formed and intend to express at the trial of this matter, along with an explanation of the basis and reasons for them as required by Fed. R. Civ. P. 26(a)(2) based on the information received to date. If, after submitting this report, I receive additional relevant information, I reserve the right to supplement this report as necessary.

Dated: August 8, 2018

*Paul T. Lauria, President*
*Mercury Associates, Inc.*
*7361 Calhoun Place, Suite 680*
*Rockville, MD 20855*
*301 519 0535 (office)*

1

## QUALIFICATIONS

I am the President of Mercury Associates, Inc., one of North America's premier providers of vehicle fleet management consulting services. I co-founded Mercury Associates in 2002.

I hold a Master's Degree in Transportation Planning from the University of North Carolina, Chapel Hill. I have more than 30 years of experience consulting with hundreds of organizations on the management of the costs of owning and operating vehicles for business purposes. Before co-founding Mercury, I was a Vice President in Maximus, Inc., where I served as national director of fleet management consulting services. Prior to that, I was a Senior Manager in the Transportation Consulting Group of Ernst & Young.

## SUMMARY OF OPINIONS

I was asked to determine whether Jason's Deli's vehicle reimbursement program reasonably reimburses its delivery drivers for the costs incurred in owning and operating personal vehicles to make deliveries for Jason's Deli and, if not, to calculate reimbursement rates that would be sufficient to reimburse drivers for these costs.

Based on my education, training, professional experience, and review of materials in this case and general industry information, and relying on vehicle cost determination methods that are sound and widely accepted in my industry, I have formed the following opinions in this case:

2

1) When an employer chooses to reimburse a large number of employees for the cost of owning and operating their personal vehicles for business use, it is standard practice in my industry to reimburse employees using an aggregate reimbursement rate, like the IRS Standard Mileage Rate or the one developed by Jason's Deli.

2) From my review of information and data furnished by Jason's Deli and other relevant industry data, I have found that its vehicle reimbursement program does not reasonably reimburse its delivery drivers for the costs they incur delivering food for Jason's Deli. Specifically, Jason's Deli's reimbursement program is flawed for the following reasons:

   a. Jason's Deli does not employ a structured, documented methodology to determine driver reimbursement rates.

   b. While little documentation was provided on the development of Jason's Deli's per-delivery reimbursement rate, the evidence that I have reviewed suggests that reimbursement rates are based only on fuel costs, implicitly assuming that that drivers do not need be compensated for maintenance and repair, insurance coverage, vehicle depreciation, and other costs of vehicle ownership or operation. This causes Jason's Deli's estimates of delivery drivers' vehicle costs to significantly understate the actual costs of owning and operating a motor vehicle. While it is true that

3

certain vehicle costs borne by drivers would exist regardless of whether or not they used their vehicles for delivery, all vehicle ownership costs are to some extent interrelated, and when a significant portion of a vehicle's utilization is for the benefit of an employer, such costs cannot be ignored based on the argument that only fuel costs need be reimbursed.

3) From my review of data on delivery driver vehicles and deliveries provided by Jason's Deli and other industry data on vehicle costs, I have calculated a reasonable per-mile reimbursement rate for each of the markets in which Jason's Deli operates, or has operated during the relevant time period, as set forth in a detailed Microsoft *Excel®* workbook appended to this report.[1]

## FACTS AND DATA REVIEWED IN FORMING OPINIONS

### A. Evidence Developed In This Case

In forming my opinions expressed herein and in preparing this Expert Report, I reviewed the following materials developed as evidence in this case:

- Questionnaires completed by the Jason's Deli delivery drivers who are currently plaintiffs in this case;[2]

---

[1] I calculated the cost per delivery mile for four Jason's Deli market regions for each of five years (2014-2018). My cost calculations and all the underlying data, assumptions, mathematical equations and formulas I used to develop them are contained in an annotated *Excel* workbook, as they are too voluminous to include in this document.

[2] The responses to this questionnaire were compiled into a table which can be found in the provided *Excel* workbook on Sheet 27.

4

- A list of Jason's Deli store locations furnished to me by Plaintiff's Counsel;

- Jason's Deli store delivery data from the years 2014 through 2018, obtained from Jason's Deli, with delivery distances calculated by Plaintiffs' Council; and

- An email exchange between Brian Hebert and Willa White of Jason's Deli, Hebert Dep. Ex. 6, which suggests the Defendant's reasoning in determining driver reimbursement rates.

## B. Industry Information

In forming my opinions expressed herein and in preparing this Expert Report, I also reviewed the following industry information:

- Vehicle fuel economy (MPG) rates for applicable vehicle models and model years published by the U.S. Environmental Protection Agency.[3]

- Vehicle fuel costs per gallon for regular gasoline for the applicable time periods and geographic regions in which Jason's Deli operated stores and made deliveries, published by the U.S. Department of Energy, Energy Information Administration.[4]

- U.S. Internal Revenue Service Standard Mileage Rates for the applicable time periods.

---

[3] Workbook sheet 16.
[4] Workbook sheet 15

- Consumer Price Indices for vehicle purchase, maintenance and repair, and insurance costs published by the U.S. Department of Labor, Bureau of Labor Statistics.[5]

- Vehicle maintenance and repair cost projections for vehicle models representative of those actually used by Jason's Deli drivers published by Edmunds as part of its *True Cost to Own*® vehicle cost calculator.[6]

- Surveys of insurance companies conducted to obtain costs of insurance for applicable vehicle models, ages, locations, and coverage types and amounts.[7]

- Estimated used vehicle private-party sale prices for vehicle models representative of those actually used by Jason's Deli drivers derived from Edmunds' *True Market Value*® calculator.[8]

I have also relied on my own knowledge and experience spanning 33 years providing and performing vehicle cost estimates for a wide array of public and private-sector entities.

It is common in my profession to rely on these sources, other than the driver questionnaire response data, in calculating vehicle ownership and operating costs. I and many of my employees have used these sources of data to estimate vehicle ownership and operating costs for corporate/commercial as well as federal, state, and local government entities.

---

[5] Workbook sheet 18
[6] Workbook sheet 19
[7] Workbook sheet 11
[8] Workbook sheets 20-26

I also relied on the work of an employee of Mercury Associates, Inc., Gary Nalven. Mr. Nalven worked under my supervision to develop the aforementioned *Excel*-based vehicle cost estimation and reimbursement rate workbook, and assisted me in drafting certain sections of this report which present information on the specific inputs to and outputs of the workbook. His work applied the methodology I describe in this report.

# BASIS FOR OPINIONS

**Opinion 1: When an employer chooses to reimburse a large number of employees for the cost of owning and operating their personal vehicles for business use, it is standard industry practice to reasonably estimate such costs on an aggregate basis.**

## A. Relevant Experience

My company and I are frequently engaged to advise businesses and governmental entities on determining and managing the costs of owning and operating motor vehicles for business purposes. I have been providing research and consulting services on such matters for more than 30 years. This includes determining and comparing the cost of organizations meeting the business vehicle needs of its employees using employer-owned versus employee-owned vehicles. For instance, as long ago as 1988, while employed by Ernst & Young, I co-directed a landmark research study on the comparative costs of employer versus employee provision of business cars.[9] More recently, I directed a study for the State of New York, one of whose objectives was to identify cost savings that could be achieved by furnishing State-owned cars to some of the State employees who collectively were receiving almost $13 million per year in reimbursement for driving their personally owned vehicles on State business.

In the course of my consulting work, I frequently have been called upon to quantify and analyze the total cost of ownership (TCO) of different types of

---

[9] Lauria, Paul T. and Taggart, Robert E., *Employer versus Employee Provision of Business Cars: A Cost Comparison*, Iselin, NJ: NAFA Foundation, May 1989.

vehicles – ranging from passenger cars to multi-million dollar pieces of mining and construction equipment – over a range of possible vehicle replacement cycles in terms of age, accumulated mileage, or both. This is the same type of vehicle cost analysis I have performed in this case to determine reimbursement rates for Jason's Deli drivers that are adequate to reasonably cover their costs of owning and operating a vehicle for business purposes.

## B. Driver Reimbursement Principles

It is generally impractical, illogical, and unnecessary for an employer to reimburse a large number of employees for the costs of the business use of their personally owned vehicles based on the actual out-of-pocket expenditures each employee makes for such use while employed. For this reason, programs that employ reimbursement rates based on the typical costs of owning and operating a vehicle are widely used by business owners as the basis for making such reimbursements. Indeed, the most obvious and widely used program of this type is the Internal Revenue Service Standard Business Mileage Rate.[10] Jason's Deli, however, does not use the Standard Business Mileage Rate for reimbursing its delivery drivers. It uses an alternative, but still aggregate or class-wide reimbursement program, under which it reimburses these drivers based on the estimated gasoline costs they incur

---

[10] See, for example, *IRS* 2017 *Standard Mileage Rates*, available at https://www.irs.gov/pub/irs-drop/n-16-79.pdf and *Internal Revenue Bulletin 2010-51* available at https://www.irs.gov/pub/irs-drop/rp-10-51.pdf.

instead of the actual expenditures they make to own and operate their vehicles.

In most situations, reimbursing individual employees for their vehicle-related *expenditures* is illogical and unnecessary because out-of-pocket *expenses* provide an incomplete picture of the total *cost* of owning and operating a vehicle for business purposes. This is because many of the largest expenses that a vehicle owner incurs are *intermittent*, not continuous, in nature. As a result, the vehicle-related expenditures made by a given driver during a given period of time – such as their period of employment with Jason's Deli – often reflect maintenance, repair, and other practices and events (e.g., an accident, a failed transmission, a replaced engine, etc.) that occurred before or after that period.

To give one example, it would be absurd to suggest that the entire cost of a major repair expenditure such as replacing a worn-out transmission in the second month of a driver's employment with Jason's Deli should be wholly borne by the company when this expense was largely the result of vehicle operation, usage, maintenance and repair, and/or other practices or events that occurred *prior* to the driver's employment. Conversely, if a driver replaces his/her transmission two months before she begins working for Jason's Deli, it is undeniable that the company derives benefits from the large expense the driver incurred to make such a repair. But if Jason's Deli reimbursed only the actual vehicle expenses incurred by the driver while employed, the company

would bear no portion of the cost of this repair despite enjoying the obvious benefits of it having been made.

Perhaps the most important reason, however, that reimbursing employees for their actual vehicle expenditures during a given period of time is not an adequate means of compensating them for these costs is that one of the largest costs associated with owning and operating a vehicle is not a discrete, out-of-pocket expense for which an employee can produce a receipt, or for that matter, understand and calculate. This cost, depreciation, accounts for an average of 46 percent of the total cost of ownership of a vehicle according to the IRS.[11]

Depreciation is a way of measuring and accounting for the costs of buying a vehicle, spread over time. It reflects the diminishing market value of the vehicle as it ages and accumulates mileage and associated wear and tear. But the exact depreciation cost of a given vehicle to a given vehicle owner cannot be determined unless and until that vehicle has been sold. It is possible, however, to estimate depreciation prior to when the vehicle has been sold based on a wealth of published information on the sales prices and realized residual values of the myriad of types of vehicles operated in the United States.

---

[11] Depreciation accounts for $0.25 of the 2018 standard mileage rate of $0.545 according to *IRS Notice 2018-03: 2018 Standard Mileage Rates, Section 4.*

It also is impractical and unnecessary to have a different reimbursement rate for each employee to account for the fact that employees drive different vehicles, purchase different insurance, use different types of tires, drive different distances, or live in different locations. Behaviors that, at first glance, may appear individual among drivers are actually captured by utilizing an average reimbursement cost. This is because of the interrelatedness of the costs of operating a vehicle.

For instance, if I base a reimbursement rate, in part, on the costs of vehicle manufacturers' recommended preventive maintenance activities, my estimates of vehicle repair, fuel, and depreciation costs obviously presume that these recommendations are being followed. But, a driver is, if anything, going to have *higher* repair and depreciation costs and lower fuel efficiency if s/he does not perform these services as recommended – this is precisely why they are referred to as *preventive* maintenance services. Thus, it is not necessary to know if and when drivers actually performed those services in calculating the costs of, and a reasonable reimbursement rate for, a typical vehicle, because assuming that they did so is a *best-case* assumption. Human nature being what it is, this assumption yields an eminently reasonable, if somewhat conservative, estimate of the costs associated with the business use of the vehicle.

For all the reasons just cited, the prevailing industry practice based on my experience consulting for organizations that permit or require their

12

employees to use their personally owned vehicles for business purposes use either the IRS Standard Business Mileage Rate or an IRS-approved FAVR (fixed and variable rate) program.

The costs of using personal vehicles for business can be estimated to a reasonable degree of certainty by applying information from a cross-section of such employees and the vehicles for which costs are to be estimated to information from a) vehicle manufacturers; b) federal government agencies such as the EPA, Energy Information Administration, IRS, and Bureau of Labor Statistics; c) transportation and vehicle-related research organizations such as Edmunds, Inc., d) insurance companies and brokers; and e) other entities. In my profession, these sources, including those that I have relied on, are reliable and appropriate to use to estimate vehicle ownership and operating costs.

For purposes of this report, my methodology for determining the costs of Jason's Deli delivery drivers' vehicles is similar to the one employed in the development the Standard Business Mileage Rate for the IRS. It involved basing reimbursement rates on the weighted average cost of vehicles of representative types, ages, and usage levels in representative locations; that is, on the costs of a typical Jason's Deli delivery driver's vehicle.

In fact, it is my opinion that this alternative approach understates the costs incurred by an employer's delivery drivers and, hence, the benefits enjoyed by the employer as a result of its reliance on employees' personally-

13

owned vehicles to meet its product distribution needs. This is, in part, because it does not account for many attenuated costs that an employer avoids by using an employee-owned fleet of vehicles, such as the time and labor costs associated with purchasing and disposing of vehicles and all the goods (e.g., fuel) and services (e.g., insurance, maintenance and repair) associated with their ownership and use.

My company has performed detailed vehicle cost analyses for organizations with as many as 10,000 leased company cars. The economies of scale associated with the performance of indirect vehicle management activities like those just cited are obviously far greater and their costs thus much lower than those that any individual vehicle owner could hope to realize. Our analyses have found that the annual costs of passenger vehicle *management activities* are generally around $200 per year. That said, I have *not* attempted to capture these indirect costs mentioned above in my methodology and have restricted my analysis to those categories of direct vehicle cost that Jason's Deli is currently reimbursing for and the direct benefits that it enjoys by utilizing the fleet owned and maintained by its drivers.

### C. Aggregate or Class-wide Reimbursement Rate

An aggregate or class-wide reimbursement rate is a single, generally per-mile, rate that is used to reflect the reasonable costs of a group of drivers. It is generally used in lieu of reimbursing for actual expenditures since, for

14

large employers, doing so would be cost-prohibitive, impractical, and contrary to industry practice.

The most widely recognized estimate of the cost per mile of owning and operating a motor vehicle is the IRS Standard Business Mileage Rate. In my experience, most businesses that do not have a fleet of vehicles but instead reimburse employees to drive their own vehicles for business purposes do so using this cents-per-mile rate. This rate, set at $0.545 for 2018, is accepted by the IRS as an appropriate substitute for the recording of actual vehicle expenses. Thus, in my field, the IRS rates are considered a reasonable estimate of vehicle expenses on which employers can rely. The reimbursement rate used by Jason's Deli, when applied to the nationwide average delivery round trip distance of 9.5 miles,[12] is significantly lower than the ones the IRS has adopted. In 2016, the IRS Standard Business Mileage Rate was $0.54 per mile. Jason's Deli's actual per-mile rate at that time, based on $1.25 to $1.50 reimbursement per delivery,[13] was $0.13 to $0.16 per mile.

It is my understanding that in some exceptional cases, an extra reimbursement is paid by store managers for deliveries outside of the store's service area. It is also my understanding, based on review of the payout

---

[12] This average distance, weighted by the number of deliveries at each store, was calculated using a sample of delivery distances furnished to me by Plaintiffs' Counsel. My understanding from discussions with Plaintiff's Counsel is that Jason's Deli does not keep easily accessible electronic records of delivery distances. The official policy is to fill out reimbursement amounts and mileages on excel tables at the store-level and then print these documents daily to hard-copy format.

[13] Jason's Deli's reimbursement rate in years 2014 through 2018 as reported to me by Plaintiff's counsel and found in Jason's Deli delivery records. *See, e.g.,* 501334 – 506807.

15

forms, that these extra reimbursements are infrequent. Additionally, these extra payouts have not been disclosed in a computer-readable data format. I accordingly reserve the right to supplement my opinion when and if additional information becomes available. However, a sampling of the available information shows that on the rare occasions that Jason's Deli provides extra reimbursements for longer deliveries, Jason's Deli appears to pay an average of 19 to 34 cents per mile. Overall, these extra payouts would not increase the average reimbursement rate more than about $.021 per mile, presuming that they are paid 10% of the time ($.34 per mile - $.13 per mile = $.21 x 10% = $.021).  However, it appears from the sampling that the additional payouts are provided for less than 10% of the total deliveries.[14]  In sum, the additional payouts have a minimal impact on the overall calculations.

I have conducted many studies, like the one I recently conducted for the State of New York, in which I was asked to advise an organization as to whether owning specific vehicles in its fleet was more cost effective than reimbursing employees for driving their own vehicles at the IRS Standard Business Mileage Rate. The State of New York reimbursed employees using the IRS rate and, in fact, spent approximately $13 million per year reimbursing drivers using this rate. So, the use of the IRS rate is widely accepted, even by large employers.

---

[14] *See* JD Extra Pay Chart provided herewith.

Some large companies, including Jason's Deli, decide to develop their own reimbursement rate rather than use the IRS Standard Business Mileage Rate. In my opinion, however, the reimbursement justification used by Jason's Deli lacks the empirical analysis and rigorous methodology needed to determine a reasonable aggregate reimbursement rate. For instance, while the IRS rate attempts to capture the costs of many vehicle types, Jason's Deli did not base the cost estimates in their rate justification on any specific vehicle type nor an aggregate of different vehicle types. For this and several other reasons discussed in this report, the Jason's Deli per-delivery reimbursement rates and Jason's Deli's justification of them are fundamentally flawed.

**Opinion 2: Jason's Deli's vehicle cost reimbursement program does not reasonably or adequately reimburse its delivery drivers for the costs they incur delivering food for Jason's Deli.**

I was asked to review Jason's Deli's delivery driver reimbursement program to determine whether it reasonably estimated and provided for the reimbursement of the expenses incurred by Jason's Deli delivery drivers.

Specifically, Jason's Deli reimbursed the vast majority of its delivery drivers at a flat rate of $1.25 per delivery during the vast majority of the recovery period. This rate was increased at just a few locations and was as high as $2.00 per delivery for one store. I have reviewed the reimbursement rates paid to delivery drivers and the methodology used to develop the rates,

and find the Jason's Deli delivery driver reimbursement program to be fundamentally flawed.

In reviewing Jason's Deli's reimbursement practices, I was not provided with any detailed information on the development of reimbursement rates, nor did I see any official policies related to rate determination. The only evidence available regarding reimbursement rate development was an email dated May 31, 2018, in which Willa White, Director of Accounts Payable for Jason's Deli, indicates that Jason's Deli's reimbursement rates are based solely on fuel costs. In this email, she makes the following assumptions: 1) average delivery vehicle fuel economy is 20 miles per gallon, and; 2) average delivery distance is 10 miles. Based on these assumptions, Ms. White determines that the average delivery round trip takes about ½ gallon of fuel, and therefore a reimbursement rate of $1.25 per delivery is reasonable based on a fuel cost of $2.50 per gallon. Ms. White goes on to state that a rate of $1.50 per delivery would be appropriate based on a fuel cost of $3.00 per gallon.

While Ms. White's assumptions about fuel economy and delivery distance appear to be fairly accurate, this reimbursement methodology is flawed in that it views fuel as the only component of vehicle costs for Jason's Deli's delivery drivers. As explained previously in this report, the standard practice in reimbursing employees for the use of their personally owned vehicles includes accounting for all sources of vehicle costs, including depreciation, insurance, maintenance, and repair, in addition to fuel. In

addition to the IRS Standard Rate, which takes all of these costs into account, examples of vehicle cost models that follow this methodology are publicly available from sources such as AAA and Edmunds.com.[15]

In summary, Jason's Deli's per-delivery reimbursement rates are not supported by any acceptable methodology used within the vehicle costing industry. The assumptions used to justify Jason's Deli's reimbursements are inconsistent with well-known principles and facts related to vehicle lifecycle costs. Jason's Deli did not consult reliable industry sources for vehicle costs, but instead developed a minimal rate based only on fuel costs. For this reason, it is my opinion that the Jason's Deli reimbursement program unreasonably reimburses drivers less than their actual costs.

---

[15] See, for example, https://exchange.aaa.com/automotive/driving-costs/ or https://www.edmunds.com/tco.html

**Opinion 3: From my review of data provided by the Plaintiffs' counsel, Jason's Deli, and other industry data, a reasonable reimbursement rate for each of the markets in which Jason's Deli operates, or has operated during the relevant time period, is as set forth in the worksheet entitled "Per Mile Costs" in the attached *Excel* workbook.**

### A. Selection of a Base Vehicle

Rather than use a single vehicle model, the approach I took to determine the vehicle ownership and operating costs on which a reasonable driver reimbursement rate would be based was to define a base vehicle that reflects the attributes of the various types and ages of vehicles most commonly used by actual Jason's Deli delivery drivers. That is, a base vehicle that is a combination or "composite" of several different vehicle types. As noted earlier, this is how the IRS Standard Business Mileage Rate is developed, and it obviously is a much more logical and defensible approach than using the estimated costs of a single model of vehicle, or limited selection of vehicle types, as the basis for a reimbursement rate for delivery drivers using hundreds of different vehicle models.

For the purposes of this report, therefore, I analyzed information produced by the plaintiffs on 492 vehicles that were used by plaintiffs over the period of 2013 to 2017. Again, because Jason's Deli did not provide any information on the vehicles used by its delivery drivers, all data used in defining a base vehicle was taken from the driver database. I assigned each of these vehicles to a specific group or class (e.g., compact sedan, SUV,

20

minivan, pickup truck, etc.) using the widely recognized and objective vehicle classification system of the U.S. Environmental Protection Agency.

I then developed a frequency distribution to determine which classes of vehicles accounted for the majority of the vehicles in the driver database. The results of this analysis are shown in Table 1. Also included in this figure is some additional information on each vehicle class that I used in determining the base vehicle costs, as is discussed in the remainder of this report.

**Table 1**
**Information Used to Define Base Vehicle**

| Vehicle Class | Count | Percentage of Vehicles in Sample | Mean Vehicle Age (years) | Model Used for Cost Determination Purposes |
|---|---|---|---|---|
| Compact | 106 | 21.5% | 9.4 | 2018 Toyota Corolla |
| Large | 33 | 6.7% | 8.9 | 2018 Chevrolet Impala |
| Midsize | 146 | 29.7% | 8.5 | 2018 Honda Accord |
| Minivan | 18 | 3.7% | 9.5 | 2018 Dodge Grand Caravan[16] |
| SUV | 96 | 19.5% | 10.0 | 2018 Ford Explorer |
| Pickup | 24 | 4.9% | 10.0 | 2018 Ford F150 2WD |
| Subcompact | 53 | 10.8% | 9.8 | 2016 Scion tC |
| Other/Unknown | 16 | 3.3% | | |
| **Total/Average** | **306** | **100%** | **9.3[17]** | |

---

[16] 2018 model years were used for all base vehicles except for the Scion tC, which was discontinued in 2016. As sufficient cost data was available for the 2016 model year, it was used as the base vehicle for the subcompact class. The Scion tC was selected because other subcompact vehicles commonly used by Jason's Deli delivery drivers either are no longer classified as subcompact (e.g. Honda Civic), have been out of production for several years (e.g. Mitsubishi Eclipse), or might be considered more costly than other subcompact vehicles (e.g. Ford Mustang).

[17] Vehicle ages were reviewed from an analysis of data furnished on questionnaires completed by the current plaintiffs in this case. Because the questionnaires did not specify in which years these vehicles served as delivery vehicles for Jason's Deli, it was assumed that all vehicles were used in year 2016 for the purpose of calculating age.

Approximately 97 percent of vehicles in the driver database fit into one of seven vehicle classes. I used the percentage distribution of these vehicles by class to combine the costs of seven vehicle classes to determine the cost of a base vehicle on which a reasonable reimbursement rate for Jason's Deli delivery drivers should be based. Specifically, I quantified the costs of owning and operating each of the seven types of vehicle, using the representative vehicle models identified in the table and the mean age of each type, and calculated the weighted average of the costs of all seven models.

**B. Vehicle Costs Included in My Analysis**

In order to determine the annual and per-mile costs of owning and operating the base vehicle on which delivery driver reimbursements should be based, I estimated several specific costs for each of the seven vehicle models identified above before combining them to arrive at the weighted average or base vehicle annual cost. I calculated these costs based on the average age of the vehicles in each class in the sample, for each year from 2014 through 2018, and for the four market regions in which Jason's Deli operated stores during this period. The costs I estimated were:

- Capital cost
- Maintenance and repair cost
- Fuel cost
- Insurance cost; and
- Registration cost.

22

The methods I used to determine each of these costs, and the resulting costs, are described in the following sections of my report. In all cases, I used methods and data sources that are common to rely on in my profession. The Microsoft *Excel*-based cost model I developed to make all my cost calculations contains most of the inputs and all of the outputs (calculations) I developed in this case. Due to the sheer volume of outputs (e.g., cost per mile calculations for the base vehicle, based on cost calculations for seven separate vehicle models that make up the base vehicle, for five years and three locations), most of my cost determination results can be found in this workbook rather than in the body of this report.

All vehicle costs cited in my report are expressed in nominal dollars as of the midpoint of the calendar year indicated. To the extent that elements of cost were determined from data sources that present these costs in today's dollars, I discounted them from July 2018, the month in which the costs in my reimbursement model were determined, to the midpoint (July 1) of the pertinent calendar year using the Consumer Price Index appropriate to the type of cost.

## C. Market Regions Served by Jason's Deli

Jason's Deli operates stores in four major market regions in the United States. These market regions, defined by Jason's Deli, are named North,

South, East, and West.[18] To account for the fact that vehicle costs such as maintenance and insurance can vary between different locations, I calculated reimbursement rates separately for each of these market regions. The cities representative of these regions were used to look up maintenance and repair costs and insurance quotes representative of each geographical region.[19] To determine an appropriate representative City for each region, I selected the city in each region with the most deliveries from 2014 to 2018.[20] The store with the most deliveries in each city was used to provide a zip code where necessary (e.g. for insurance quotes). My cost per mile rates for each year are weighted by the number of deliveries for stores in each market region.

### D. Miles Driven and Business Use

My per-mile cost calculations were based on the average number of miles driven per year for delivery use by the typical Jason's Deli driver. My estimates of the average number of delivery miles per year for each market region are based on delivery records for Jason's Deli stores from December 2014 through April 2018. Because Jason's Deli did not provide delivery distance data, Plaintiff's Counsel provided me with an estimate of average

---

[18] A store list entitled "2016 Corporate Deli Audit Listing" produced by Jason's Deli and containing store ID numbers, addresses and geographical regions was furnished to me by Plaintiffs' Counsel.

[19] Fuel prices also vary by geographical region; however, historical fuel price data were not available at the City level, so a single average annual fuel price was used for the entire state.

[20] Delivery records for the period from December 2014 through April 2018 for all Jason's Deli stores involved in this case were furnished to me by Plaintiffs' counsel.

delivery distance for each store, based on calculations of round trip distances for a sample of approximately 20 deliveries for each store.

To estimate average annual delivery miles for Jason's Deli drivers, I calculated the average number of deliveries per month for each of the 399 drivers who made the deliveries recorded in the data provided by Jason's Deli. I then multiplied this by the average delivery distance for the store at which each driver was employed to determine the average monthly miles, and then annualized this amount by multiplying by 12. For all regions combined, the average annual delivery miles driven was 6,462, with a high of 7,770 for the West region and a low of 5,039 for the North region. The average round trip delivery distance was 9.5 miles.

Data on personal use of delivery vehicles was not provided to me. To estimate combined annual mileage, I assumed that vehicles were driven 12,000 miles per year for personal use, which is somewhat less than the national average for personal vehicles. The combined personal and delivery mileage was used to calculate per-mile costs for all fixed costs (i.e. capital cost, insurance, and registration).

### E. Vehicle Capital (Depreciation) Cost

For purposes of developing a driver reimbursement rate, the most accurate and equitable way to calculate a vehicle's capital cost is to determine the reduction in its fair market value (FMV) during a given year of its life, based on the average age and accumulated mileage of the vehicles of that

type in the driver population (determined through appropriate sampling methods).

To determine the capital costs of each model of vehicle shown in Table 1 above, I developed seven separate multiple regression equations based on used vehicle sales data published by Edmunds.com.[21] The data provided by Edmunds is based on actual car sales and collected from a variety of nation-wide sources. In my professional opinion, Edmunds is a reliable industry source for determination of vehicle fair market values (FMVs) and depreciation costs. I used this data to estimate the FMV as a percentage of original purchase price for each type of vehicle in the analysis based on two independent variables, age and average annual mileage. All of these equations had excellent regression coefficients ($R^2$), ranging from 0.91 to 0.97. The data used to develop these equations and the equations themselves can be found in my *Excel*-based cost determination workbook file.

I used these equations to estimate the change in fair market value, i.e. the annual capital or depreciation cost, for each type of vehicle. To determine the capital cost, I calculated the beginning and ending fair market values for each type of vehicle over a one-year period, based on the assumed age and mileage of each vehicle type at the beginning and end of the year. This annual capital cost was divided by total annual mileage to arrive at the capital cost

---

[21] https://www.edmunds.com/appraisal/.

per mile. These capital costs were then adjusted for inflation to come up with the capital costs per mile in each year. [22]

For example, the average age of the large sedans in the driver database, for which the Chevrolet Impala is the representative vehicle model, was 8.9 years, meaning that, on average this vehicle would be 8.4 years old at the beginning of a given year and 9.4 years old at the end of the year. Because I would not assume that the vehicle has been driven for delivery purposes its entire life, I instead assumed that in previous years the vehicle traveled an average of 15,000 miles per year, meaning the vehicle would start the year with 126,000 miles on the odometer. For a vehicle in the "South" region, the mileage at the end of the year would be 145,184 to account for the combined total of 12,000 personal miles and 7,184 delivery miles driven during the year. Based on these variables, my regression equation calculates the fair market value of the Impala at the beginning of the year would be $2,477, and $1,990 at the end of that year. The resulting reduction of $487 in the FMV was the capital cost (in 2018 dollars) of the vehicle in that year. This capital cost was then adjusted for inflation according to the Consumer Price Index (CPI) for new car or truck prices for the appropriate year.

---

[22] Using the appropriate Consumer Price Index (CPI). Inflationary adjustments were made based on information published by the U.S. Bureau of Labor Statistics: *Consumer Price Index – New Cars (All Urban Consumers, Not Seasonally Adjusted), 1990-2017*, (Series ID CUSR0000SS45011); and *Consumer Price Index – New Trucks (All Urban Consumers, Not Seasonally Adjusted), 1990-2017*, (Series ID CUSR0000SS45021).

27

My vehicle purchase price adjustments (for inflation) and capital cost calculations by vehicle type, location, and year are shown in my *Excel*-based vehicle cost determination workbook file.

## F. Vehicle Maintenance and Repair Costs

Including repair costs in the determination of a reimbursement rate for Jason's Deli delivery drivers is essential due to the advanced age of these vehicles and due to factors with which virtually anyone who has owned a personal car or truck is familiar: the cumulative effects of wear and tear on vehicle systems and parts, the expiration of manufacturers' warranties, and the ever-increasing quality and durability of newly manufactured vehicles (which makes newer vehicles less expensive to repair than older ones, all other things being equal).

Fortunately, there is a significant amount of publicly available information that one can use to estimate the annual maintenance *and* repair costs of Jason's Deli delivery drivers' vehicles. One such source is Edmund's, a company that has been publishing vehicle specification and cost information since 1966. In my practice, Edmund's *True Cost to Own®* tool[23] is a source of information commonly relied on and used to estimate vehicle ownership and operating costs. I used information from this source to determine the maintenance and repair costs of each of the seven types of vehicle whose costs comprise, on a weighted average basis, the costs of my base vehicle.

---

[23] www.edmunds.com/tco.html.

Specifically, I obtained estimated maintenance and repair costs by year for each of the first 10 years of the vehicle's life for each of the seven specific vehicle models included in my analysis. I then developed equations from these data for estimating, separately, vehicle maintenance and repair costs as a function of vehicle age and accumulated mileage.

The costs of unscheduled repairs, which increase steadily as vehicles age, were modeled through regression analysis of the Edmunds data. All of the regression equations I developed had high goodness of fit ($R^2$) statistics, ranging from 0.79 to 0.83, meaning that changes in the independent variable, vehicle age, are a very good predictor of changes in the dependent variable, annual repair cost.

To estimate the costs of scheduled maintenance, which fluctuate from year to year based on the manufacturers' recommended service schedules for different vehicle components, I applied a smoothing algorithm, which is a common approach to modeling and forecasting quantities that fluctuate up and down over time. Because Edmunds' *TCO*® tool only provides maintenance and repair cost estimates based on the assumption of 15,000 annual vehicle miles traveled, it was necessary to add a scaling factor to these equations to account for the fact that the average vehicle driven by a Jason's Deli delivery driver accumulates mileage at an annualized rate of significantly more than 15,000 miles per year.

29

I used these models to estimate annual maintenance and repair costs for each type of vehicle whose costs make up my base vehicle cost. I determined these costs based on average vehicle age and odometer reading (by location, since total annual mileage varies by region, as explained above) for each of the seven vehicle models. For example, I determined that a Honda Accord in Houston with an average age of 8.5 years had an annual maintenance and repair cost in 2018 of $1,273; I then scaled this cost based on Edmunds' assumption of 15,000 annual miles to arrive at a maintenance and repair cost per mile of $0.08. I adjusted these costs for inflation for each year from 2014 through 2018 using the appropriate Consumer Price Index. To account for regional differences in labor rates and other maintenance and repair costs, I developed a scaling factor for each geographical region in which Jason's Deli operated delivery stores, based on Edmonds' *TCO®* tool lookups for various ZIP codes.

Estimating the maintenance and repair costs of older vehicles can be difficult, as the actual costs incurred can vary based on many factors including that nature of use, driving environment, adherence to manufacturers' guidelines, and even random chance. However, in my practice I have regularly collected and analyzed maintenance cost data for fleets that operate large numbers of vehicles ranging in age from brand new to 15 years and older. Based on the analyses I have performed in my career and the data my company has collected, I can attest that the estimated maintenance and repair

30

costs produced for this report using Edmunds data are within reasonable boundaries of what I would expect for vehicles 8 to 10 years of age.

The Edmunds data used to develop these equations, the equations themselves, and the annual maintenance and repair costs I determined for each of the vehicle models that comprise my base vehicle can be found in my *Excel*-based cost determination workbook file.

It should be noted that the maintenance and repair costs that I developed using this methodology likely *understate* the actual costs incurred by Jason's Deli delivery drivers for several reasons. One is the type of driving associated with making deliveries, such as driving primarily in urbanized or near-urban areas with relatively heavy traffic congestion, resulting in frequent starts, stops, and turns; and frequent engine starts and stops. Edmunds *True-Cost-to-Own*® tool quantifies annual maintenance and repair costs by vehicle age based on 15,000 annual miles of vehicle use, which undoubtedly includes a more balanced mix of city and highway driving than delivery driver vehicles are likely to experience.

The second reason that the maintenance and repair costs of my base vehicle understate the costs that Jason's Deli delivery drivers likely experienced is that they are based on the costs of 2018 model year vehicles. It is widely acknowledged that cars are better engineered and manufactured and far more reliable today than were the vehicles manufactured 10 to 20 years ago, and that they have lower repair costs than do the vehicles (with an

31

overall average age of 9.3 years) that Jason's Deli delivery drivers were operating in, say, 2014.[24]

## G. Vehicle Fuel Costs

I determined the annual fuel cost of each base delivery vehicle using three key inputs: annual miles driven, vehicle fuel efficiency in miles per gallon (MPG), and fuel prices for the years 2014 through 2018.

I developed my MPG parameters as follows. I began with the EPA City MPG rating for each type of vehicle whose weighted average costs make up the cost of my base vehicle. Whereas my determination of vehicle capital and maintenance and repair costs used as the point of departure the costs of 2018 model year vehicles, my fuel cost calculations used the EPA ratings for vehicle models that would have been the same average age as were the Jason's Deli delivery driver vehicles in the years 2014 through 2018.

Thus, for example, the average age of the large sedans in the Jason's Deli driver database (as shown in Table 2 above) is 8.9 years. Accordingly, to determine the fuel cost of a mid-size sedan in, say, 2014, I began with EPA's City MPG rating for a 2005 Chevrolet Impala. For 2015, I used the rating for a 2006 Malibu; and so forth.

Once I had determined the appropriate EPA MPG ratings to use, I made two adjustments to these ratings. First, I reduced them by 10 percent to

---

[24] See, for example, JD Power *2013 US Vehicle Dependability Study* (press release available at http://autos.jdpower.com/ratings/dependability-press-release.htm); and recent American Enterprise Institute article at http://www.aei-ideas.org/2013/02/when-it-comes-to-new-vehicles-todays-models-are-cheaper-and-more-reliable-than-ever-before/.

reflect the fact that EPA ratings are well known by professional fleet managers who actually measure the fuel economy of the vehicles they manage to overstate the actual fuel consumption rates achieved by vehicles due to the fact that they are developed based on tests performed under laboratory conditions rather than in real-world driving conditions.[25]

That said, EPA test results indicate that vehicles achieve higher fuel efficiency rates (i.e., lower MPG) when running continuously than immediately after both cold and hot starts. EPA's City MPG ratings are derived from the results of Federal Test Procedure 75, which is conducted in three phases using the EPA's Urban Dynamometer Driving Schedule: after a cold engine start; after the vehicle engine has been running for eight and one-half minutes; and after a hot engine start, which is initiated after an engine has been run for approximately 23 and just off for 10 subsequent minutes.

By comparing the average MPG ratings calculated by the EPA for each of these three test phases, I found that the phase one testing resulted in 16 percent lower fuel economy on average for all tests completed in 2011 (the first year that these results were made publicly available). Based on the frequency with which delivery drivers stop and start their cars, the actual fuel economy figures experienced by the delivery drivers are more accurately represented by the lower results that were observed during the cold start

---

[25] See, for example, *Here's Why Real-World MPG Doesn't Match EPA Ratings*, available at http://www.edmunds.com/fuel-economy/heres-why-real-world-mpg-doesnt-match-epa-ratings.html; and *About EPA Ratings* available at http://www.fueleconomy.gov; EPA Fuel Economy Guide (updated Feb. 20, 2013) pp. i & 39.

testing phases of the EPA fuel economy rating process. I chose to use a reduction of 10 rather than 16 percent to be conservative.

The results of each of these phases of testing are accessible at the Test Car List Data Files section of the EPA's Office of Transportation and Air Quality's website[26]. The procedures for testing are outlined in the Code of Federal Regulations, specifically 40 CFR §1066.[27]

After making this 10-percent downward adjustment, I next reduced the EPA City MPG ratings a further one percent per year of average vehicle age to account for the cumulative effects of wear and tear on vehicle engines and transmissions that occurs as vehicles age. This is consistent with the findings of research I have conducted for organizations that have large numbers of business vehicles of the same type and across a range of ages and appropriate longitudinal data on actual amounts of fuel consumed by these vehicles.

Thus, for example, in 2014 an 8.9-year old Chevrolet Impala would have had an original EPA City MPG rating of 19 when it was new in 2005. I adjusted this rate downward to 17.1 MPG to account for EPA's overstatement of actual vehicle fuel efficiency rates and test results that show that frequent engine starts and stops reduce fuel efficiency. I then adjusted it downward to 15.6 to

---

[26] US Environmental Protection Agency. Office of Transportation and Air Quality. *Test Car List Data*, accessed September 4, 2014, http://www.epa.gov/otaq/tcldata.htm.
[27] US Environmental Protection Agency. Office of Transportation and Air Quality. National Vehicle & and Fuel Emissions Laboratory. *Test Procedures and Chemistry Methods*, accessed September 4, 2014, http://www.epa.gov/nvfel/testing/procedures.htm.

account for 8.9 years of accumulated age and mileage and associated wear and tear.

For each of the vehicle models whose costs comprise the cost of my base vehicle, I divided the average annual miles driven by the adjusted MPG rate to determine the number of gallons of fuel consumed per year. I then multiplied these amounts by the average cost of a gallon of regular gasoline between 2014 and 2018 to arrive at the annual cost of fuel per vehicle. The fuel costs per gallon that I used to determine vehicle fuel costs were the average annual prices published by the U.S. Energy Information Agency.[28] These prices, which are in nominal dollars and thus did not need to be adjusted for inflation using a Consumer Price Index, are shown in my *Excel*-based vehicle cost determination model workbook.

The original EPA City MPG ratings and the adjustments I made to the ratings can be found in my *Excel*-based vehicle cost determination workbook. So too can the fuel price per gallon data by geographic area by year.

**H. Vehicle Insurance Costs**

I estimated insurance costs by obtaining two insurance premium quotes for each geographic region in which Jason's Deli operated stores from 2014 to 2018, for each vehicle model whose costs are included in the cost of my base vehicle, based on the average age of each type of vehicle in each year of the period covered by my report, 2014-2018. For example, I obtained quotes for

---

[28] http://www.eia.gov/dnav/pet/pet_pri_gnd_dcus_nus_w.htm.

a 2009 Chevrolet Impala (in 2018 when such a vehicle would be 9 years old) because the average age of large sedans in the driver database, of which the Impala is the representative model, was approximately 9 years. The quotes were obtained in 2018 dollars, so I adjusted them for inflation (i.e., reduced them) to reflect the cost that would have been incurred in each of these years using the appropriate Consumer Price Index.

I made conservative assumptions about the driver, the use of the vehicle, and the insurance coverage in order to obtain insurance premium quotes. With three exceptions, I intentionally used assumptions that would, if anything, result in lower insurance costs than are likely to have been incurred by actual Jason's Deli delivery drivers. These assumptions were the following. The driver is a 37-year old, single, male who has good credit, no accidents/tickets, a high school education, and is a homeowner. The vehicle is used for business five days a week, is driven approximately 18,000 miles a year, and is parked in a garage when not in use. The insurance coverage includes the following limits/deductibles:

- Bodily Injury – $100,000/$300,000
- Property Damage – $50,000
- Medical Coverage – No Coverage (unless required)
- Uninsured Motorist Property – $100,000/$300,000
- Comprehensive – $1,000
- Collision – $1,000
- Glass Deductible Buyback – No Coverage
- Towing and Road Service – No Coverage (unless required)
- Collision Plus/Loss of Use – No Coverage

- Uninsured Motorist/Liability – $50,000/$100,000

It should be noted that I included collision and comprehensive coverage in my cost analysis due to the manner in which I quantified vehicle capital costs and to account for the cost of repair in the event of an accident, reduced by the probability that such accident repair costs will be incurred. My calculation of capital costs assumes that vehicles have fair market values at the end of each year that are not diminished by the presence of unrepaired vehicle damage, whether it be from collisions, vandalism, storm damage, or any other cause. This assumption only makes sense to the extent that I also assume that drivers carry the insurance coverage necessary to repair such damage when it occurs. Because of these methods, and the fact that delivery drivers are in effect self-insuring their vehicles, whether or not individual drivers actually purchase such coverages has no bearing on the determination of vehicle costs.

More importantly, insurance coverage for such hazards is obviously the most economically efficient way to pay for their costs. Drivers who choose not to carry such coverage can be expected to pay more for such hazards in the form of higher repair costs at rates not negotiated with body shops and other service providers in advance by insurance companies, and/or lower residual values when they sell vehicles with unrepaired damage.

37

**I. Vehicle Registration Cost**

I determined vehicle registration costs based on publicly available vehicle registration fee costs for the states of Texas, Georgia, and Illinois which contain the representative cities for each region. Rather than making assumptions about how much tax a driver would have paid on their vehicle when it was purchased, I used only the state registration fee in my cost model. Because sales taxes and other local vehicle taxes are not included in this amount, my estimates understate the actual taxes paid by drivers.

**J. Total Vehicle Cost per Mile**

The *Per Mile Costs* worksheet in my *Excel*-based cost determination workbook summarizes the end results of this process, showing my calculations of the cost per mile in each region and in each year from 2014 through 2018 In comparison to Jason's Deli's minimal cost analysis, my analysis takes into account all the key types of vehicles used by delivery drivers, the frequency with which those classes of vehicles appear in the total population of delivery driver vehicles for which I was provided information, the average age of each type of vehicle, and all costs of ownership incurred by the driver. Table 2 below contains the average unreimbursed vehicle costs per mile per region across all years in the class period, increased by $.021 for additional payouts (see explanation above). Jason's Deli's effective reimbursement rate is calculated using the average round trip delivery distance of 9.5 miles, and the reimbursement rate of $1.25 per delivery, which was the rate used for the

vast majority of deliveries during this time period. The differences, even using my rates and not the IRS rate or the rates Jason's Deli reimbursed its managerial and corporate employees, are significant and support my conclusion that Jason's Deli's reimbursement methodology is unreasonably low.

**Table 2**
**Average Unpaid Vehicle Costs per Mile Related to Business Use, Year**

| Year | Jason's Deli Effective Reimbursement Rate | My Rate | IRS Rate | Manager Rate |
|------|------------------------------------------|---------|----------|--------------|
| 2014 | $ 0.151 | $ 0.46 | $ 0.560 | $0.510 |
| 2015 | $ 0.151 | $ 0.40 | $ 0.575 | $0.525 |
| 2016 | $ 0.151 | $ 0.40 | $ 0.540 | $0.490 |
| 2017 | $ 0.151 | $ 0.42 | $ 0.535 | $0.485 |
| 2018 | $ 0.151 | $ 0.45 | $ 0.545 | $0.495 |

The *Excel* workbook containing my vehicle costing calculations and results breaks down these same figures on a region-by-region and year-by-year basis, showing that Jason's Deli's failure to accurately estimate vehicle costs is systematic and continuous across the class periods and regions.

To be clear, I maintain that the IRS Business Mileage Rate is an accurate and reasonable reimbursement rate. The actual costs per mile I have calculated provide a more conservative reimbursement based on the data I review and assumptions I made, and are thus the minimum amount necessary to reimburse drivers for their vehicle expenses incurred making deliveries. Given that the manager rate exceeds my conservative rate, it is also my

39

opinion that the manager reimbursement rate, which is set at 5 cents below the IRS rate, is an accurate and reasonable reimbursement rate. Indeed, given the generally more-expensive nature of delivery driving, it is more logical to reimburse delivery driving at a higher (not lower) rate than general business use.[29]

**Resulting Damages**

Attached hereto is a spreadsheet titled "JD damage calculations.xlxs." I incorporated my reimbursement rates in the form of blended annual averages by region into this spreadsheet. The other data within the spreadsheet was compiled by Plaintiff's council from Jason's Deli's disclosures.

Damages were calculated by determining the difference between each driver's estimated reimbursement and the estimated cost to the driver based on the rates I developed for the years 2014 through 2018. As directed by Plaintiffs' counsel, referring to the aforementioned workbook, for each work week (represented by a row on the "Calculations" sheet), I multiplied the number of deliveries by the per-delivery reimbursement for that driver in that week to determine the driver's reimbursement (column "X"). I then estimated the total miles driven (column "Y") by multiplying the number of deliveries by the average miles per delivery (9.5 miles). I multiplied the total miles driven by the per-mile rate I developed for the year in which the work week started (column "Z") to determine the estimated vehicle cost for that week (column

---

[29] *See infra* pp. 30 – 31.

"AA"). Finally, I determined the damages (column "AC") by subtracting the total reimbursement for that week and the amount the driver was paid above minimum wage ($7.25 per hour, calculated in column "AB") from the estimated vehicle cost.

The total damages I calculated amount to $347,759 for the period from December 2014 through April 2018. Delivery data for drivers still employed by Jason's Deli after April 2018 was not available to me at the time of this report. Thus, I reserve the right to supplement the damage calculations after receiving additional delivery data.

My calculations and opinions expressed herein are based on methodologies, formulas, and sources of data commonly relied on in my field of practice, which is the calculation of the costs of owning and operating a vehicle for business purposes. I have reached all of my opinions and conclusions to a reasonable degree of certainty consistent with the standards applied in my field of practice. I am prepared to testify regarding the opinions and conclusions contained in this report.

### Compensation for My Work

I am being compensated for my work at a rate of $250 per hour, except for time spent testifying in deposition or court, in which case my rate is $325 per hour.

Dated: August 8, 2018

Paul T. Lauria
Paul T. Lauria

41